AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original  ☐ Dupli[cate]

CLERK'S OFFICE
A TRUE COPY
May 18, 2026
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>locations associated with B.B. | )<br>)<br>)<br>)<br>)<br>) |

Case No.      26-MJ-88

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

     see Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

     see Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before    06/01/2026    *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.      ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to    Honorable William E. Duffin    .
                                             *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
     ☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    05/18/2026 at 10:15 a.m.           *William E. Duffin*
                                                       *Judge's signature*

City and state:    Milwaukee, WI           Honorable William E. Duffin, U.S. Magistrate Judge
                                                     *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# ATTACHMENT A

## *LOCATIONS TO BE SEARCHED*

3255 N. 34th Street, Milwaukee, WI and 3367 N. 50th Street, Milwaukee, WI (collectively, the TARGET PREMISES)



3255 N. 34th Street, Milwaukee, WI is the lower of a two story duplex, having a tan/green siding with yellow trim. The numbers 3255 are vertically displayed to the south of the east facing front entrance door to 3255 N. 34th St. The area to be searched includes the attic, basement, garages, storage lockers, crawlspaces, safes, and common areas that are accessible to the occupants of the lower residence, as well as Brian Brown.

68



3367 N. 50th Street, Milwaukee, WI is a two-story single family residence featuring brick siding with white siding; the numbers "3367" are horizontally displayed to the north of the east facing entrance door to 3367 N. 50th St. The area to be searched includes the attic, basement, garages, storage lockers, crawlspaces, safes, and common areas that are accessible to the occupants of the residence, as well as Brian Brown.

69

# ATTACHMENT B

## ITEMS TO BE SEIZED

1. The items to be seized are evidence, contraband, fruits, records or instrumentalities relating to violations of Title 21, United States Code, Sections 841(a)(1) (possession with the intent to distribute and distribute controlled substances), 846 (conspiracy to possess with the intent to distribute and distribute controlled substances), and 843(b) (use of communications facilities to facilitate controlled substance felonies) from January 1, 2025 to the date of this warrant, namely:

   a. Controlled substances and/or paraphernalia;

   b. Packaging for controlled substances;

   c. Drug ledgers and/or documentation;

   d. Records and information relating utility bills, writings, cell phones, computers, receipts, notes, ledgers, receipts and/or other documentary evidence establishing who is in control of the premises;

   e. Firearms, including pistols, handguns, shotguns, rifles, assault weapons, machine guns, magazines used to hold ammunition, silencers, components of firearms, including laser sights and other components which can be used to modify firearms, ammunition and ammunition components, bulletproof vests, gun boxes, and any and all documentation related to the purchase of such items;

   f. Records of off-site storage locations, including but not limited to safe deposit box keys and records, and records and receipts and rental agreements for storage facilities;

   g. Duffel, canvas bags, suitcase, safes, or other containers to hold or transport controlled substances and drug trafficking related items and proceeds;

   h. Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, bank statements, safe deposit box keys and records, money containers, financial records and notes showing

70

payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances;

i. Photographs, videotapes, or other depictions of assets, firearms, co-conspirators, or controlled substances; and,

j. Records and information relating to the identity or location of Brian Brown.

2. Any digital device which is itself or which contains evidence, contraband, fruits, records, or instrumentalities of the **TARGET OFFENSES**, and the forensic copies thereof.

3. Any digital device which is itself or which contains evidence contraband, fruits, records, or instrumentalities of the **TARGET OFFENSES**, and forensic copies thereof.

4. With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

b. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the attachment of other devices;

d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e. evidence of the times the device was used;

f. applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

g. records of or information about Internet Protocol addresses used by the device.

71

5. As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

6. As used herein, the term digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras, gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## SEARCH PROCEDURE FOR DIGITAL DEVICES

7. In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

    a. Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be search at that location. The search team shall complete the search as soon as practicable but not to exceed 120 days from the date of execution of the warrant. The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

72

b. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

    i. The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

    ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

    iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

b. The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

c. If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as practicable, return the device and delete or destroy all forensic copies thereof.

d. If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data and may access such data at any time.

e. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government

73

may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

f.  The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

g.  After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

   i.  The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

   ii.  The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

74

CLERK'S OFFICE
A TRUE COPY
May 18, 2026
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

In the Matter of
*(Briefly describe the property to be searched
or identify the person by name and address)*

locations associated with B.B.

)
)
)
)
)
)

Case No.        26-MJ-88

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

see Attachment A,

located in the _____Eastern_____ District of _____Wisconsin_____ , there is now concealed *(identify the person or describe the property to be seized)*:

see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841, 843, 846 | distribution of controlled substances; use of a communication facility to distribute controlled substances; and conspiracy to distribute controlled substances |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

❏ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Jonathon Newport*
Digitally signed by Jonathon Newport
Date: 2026.05.13 18:32:05 -05'00'

*Applicant's signature*

ATF TFO Jonathon Newport

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means).*

Date:    05/18/2026

*William E. Duffin*

*Judge's signature*

City and state:    Milwaukee, Wisconsin

Honorable William E. Duffin, U.S. Magistrate Judge

*Printed name and title*

AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT

I, Jonathon Newport, being first duly sworn, hereby depose and state as follows:

INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to search 3255 N. 34th Street, Milwaukee, WI and 3367 N. 50th Street, Milwaukee, WI (collectively, the TARGET PREMISES), as described below and in Attachment A, for evidence of violations of Title 21, United States Code, Sections 841(a)(1) (possession with the intent to distribute and distribute controlled substances), 846 (conspiracy to possess with the intent to distribute and distribute controlled substances), and 843(b) (use of communications facilities to facilitate controlled substance felonies) (collectively, the TARGET OFFENSES).

2.      The TARGET PREMISES are more fully described below:



[3255 N. 34th Street, Milwaukee, WI, the lower of a two story duplex, having a tan/green siding with yellow trim. The numbers 3255 are vertically displayed to the south of the east facing front

entrance door to 3255 N. 34th St. As described below, law enforcement believes this location is used a "stash house" by drug trafficker Brian Brown.]



[3367 N. 50th Street, Milwaukee, WI, a two-story single family residence featuring brick siding with white siding; the numbers "3367" are horizontally displayed to the north of the east facing entrance door to 3367 N. 50th St. As described below, law enforcement believes this location is the primary residence of drug trafficker Brian Brown.]

3.      I am a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms & Explosives and have been since November of 2024. I am tasked with investigating federal firearm violations, including possession of machine guns, straw purchasing of firearms, felons in possession of a firearm, and firearm trafficking. I have been a Police Officer for the Milwaukee Police Department and have been a Police Officer for over twelve (12) years. I am currently assigned to the Milwaukee Police Department's Special Investigations Division. I am assigned to the Violence Reduction Unit, responsible for aiding in investigations of crimes, such as, but not limited to: Homicide, First Degree Reckless Injury, First and Second Degree Recklessly Endangering Safety, Armed Robbery, weapon offenses, and drug dealing. I am primarily focused

2

on investigating drug and firearm offenses, contrary to Wisconsin State Statute and USC. I have primarily investigated drug and firearm offenses for over twelve (12) years in various capacities, including federally as a Task Force Officer for the FBI and currently for ATF. I am considered an expert by court standards and have testified as an expert in court proceedings related to drug dealing of marijuana, cocaine, heroin, fentanyl and methamphetamine. I have been involved in the execution of at least 500 residential search warrants. I have been the affiant and assisted in firearm and drug search warrants to include: residential, forensic cell download/analysis, social media, cloud storage, GPS, and trap and trace to aid in investigations. I have attended various trainings regarding firearm and drug investigations to include: Characteristics of Armed Gunmen, Non-Drug evidence, Detective Development Course, Plain Clothes (Undercover) Training, Drug Expert Court Testimony, Undercover Operations in Cook County Criminal Justice System, Effective Investigative Techniques of Cellular Phones in Investigations, and the FBI's Understanding Investigative Techniques for Modern Communication Course.

4.      The facts in this affidavit come from my personal observations, my training and experience, my review of documents, information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on the facts set forth in this affidavit, there is probable cause to believe that the TARGET OFFENSES have been committed, are being committed, and will be committed by Brian Brown and others, and evidence of those offenses will be found at the TARGET PREMISES, given Brown's connections to the same.

3

6. Law enforcement officers are investigating Brian Brown and his associates for distribution of controlled substances. The investigation to date has included traditional law enforcement methods, including, but not limited to: information from other law enforcement officers, search warrants, documentary evidence, telephone toll data, public records, and physical surveillance.

7. In December of 2025, Task Force Officer Jonathon Newport initiated a drug investigation into the residence of 5237 North Sherman Boulevard #1. On December 24, 2025, Officer Newport conducted surveillance of 5237 North Sherman Boulevard #1 (Milwaukee, WI), due to an anonymous drug tip that the Milwaukee Police Department received on December 24, 2025, in MPD CAD P2512240406.

8. Officer Newport observed that there were two vehicles that were parked out front, a red 2024 Chevrolet Trailblazer (WI IBLVND3, VIN 3GNKBHR46RS164292) and a silver 2002 Chevrolet Suburban (WI 141WYM, VIN 1GNFK16Z42J274256). A DOT check showed that Gabrielle R. Mallory (DOB: 04/07/1966) of 5237 North Sherman Bl #3 (Milwaukee, WI) registered the Trailblazer. A DOT check showed that Wardell Crutchfield (DOB: 02/13/1946) of 535 West Concordia Avenue #15 (Milwaukee, WI) registered the Suburban. At 11:57AM, a black male appeared from the front door, walked to the south and entered the front door to 5233/5233A North Sherman Boulevard. At 12:06PM, a woman and man exited the side door to the multi-unit residence, entered the Suburban and drove away. At 1:17PM, a woman wearing a pink hat appeared from the south, walked to the front door and entered. The woman remained inside of the target house at the front door, exited less than thirty-seconds from the same front door, and walked

4

away south. Based on the woman appearing on foot from the south, being at the target house for less than thirty seconds, with the anonymous tip that there are drug sales from the residence, Officer Newport believes that this was a suspected drug sale.

9.      Officer Newport conducted a check through Milwaukee Police Department records to establish that the front door was to unit 1 of the target house. Officer Newport observed on January 8, 2025, Milwaukee Police responded to that location for trouble with subject / property owner - tenant problem. The Officers that responded met with the caller from unit 1, who allowed Officers inside of unit 1, which was the front door where Officer Newport observed the woman in the pink hat enter and exit.

10.      Officer Newport watched the Officer's body worn camera, which showed Richard Jackson with phone number of (414) 678-6584 was the caller. Jackson was with an unknown woman in the first bedroom as you enter the residence on the north side. Jackson told Officers that his roommate/property owner lived in the next bedroom to the west on the north side of the house, who Jackson identified as "Kenneth Wade". Jackson told Police that Wade left in the white four-door car with a Wisconsin registration plate of AYD9590; a DOT check showed that Terry Stocks (DOB: 11/04/1968) of 232 North 75th Street (Milwaukee, WI) registered a cream/ivory 2008 Saturn Outlook SUV with that registration plate, with a VIN of 5GZER23718J196812. In summary, Jackson told Police that he subleased from Wade by renting the room from him, which made Wade the "landlord". Wade left before Police arrived.

11.      On December 26, 2025, Officer Newport conducted surveillance of 5237 North Sherman Boulevard #1 (Milwaukee, WI) regarding the drug dealing compliant. At 9:45AM, a woman exited the front door to 5233 North Sherman Boulevard (next door neighbor to the south),

5

walked to the front door, removed the mail from a mailbox and entered the front door to the 5237 North Sherman Boulevard #1 at 9:46AM. At 9:47AM, the same woman exited the front door in her robe and walked back to her residence.

12.     On December 29, 2025, Officer Newport conducted surveillance of 5237 North Sherman Boulevard #1 (Milwaukee, WI), as part of an ongoing drug investigation. As Officer Newport arrived, Officer Newport observed a black 2012 Honda Odyssey minivan (WI AUL5771, VIN 5FNRL5H68CB003660). A DOT check showed that Savannah F. Brown (DOB: 12/28/1999) of 3367 North 50th Street (Milwaukee, WI) registered the Odyssey. Officer Newport did not see the red Trailblazer that was parked in front of 5237 North Sherman Boulevard #1 the last two times on surveillance. At 12:07PM, the woman commonly wearing the brown robe from 5233 North Sherman Boulevard (next-door neighbor) exited her house, walked to the 5237 North Sherman Boulevard #1 and entered the front door. At 12:10PM, the woman exited, walked back to her house and entered. At 12:12PM, a man exited the target house, identified as Brian D. Brown (black male, 05/18/1973), entered the driver seat of the Odyssey, grabbed an item, exited the driver seat and walked back into the 5237 North Sherman Boulevard #1. At 12:14PM, Brian Brown exited the house carrying a soda can, entered the Odyssey and drove away. Officer Newport conducted a check of the registration plate on the Odyssey and then a check of law enforcement databases to locate Brian D. Brown. Officer Newport reviewed a Milwaukee Police Department booking photo and Wisconsin Driver's License photo of Brian Brown to confirm it was him. At 12:33PM, the neighbor woman in the brown robe exited her residence carrying a black plastic bag, though Officer Newport could not discern the content of the bag. The neighbor entered the front door of 5237 North Sherman Boulevard #1. At 12:38PM, she exited the front door and walked back to her

6

house. When the neighbor left, she was not carrying the black bag anymore. At 12:43PM, Brian Brown returned in the Honda Odyssey and parked in the front. Brian Brown walked and freely entered the front door to 5237 North Sherman Boulevard #1. At 12:45PM, Brian Brown exited the front door and walked towards the driver's door. As Brian Brown was walking, Officer Newport observed a larger bulge in Brian Brown's right pants pocket. Brian Brown was already holding a cell phone and car keys in his right hand. Brian Brown drove away in the Odyssey. At 12:50PM, a black Lexus without registration plates parked in front of 5237 North Sherman Boulevard #1. The front passenger was a woman, who exited, walked to the front door, knocked on the front south window, and was allowed in. At 12:52PM, the woman exited, entered the Lexus, where the driver and woman looked down at something in the car together and drove away. They drove around and parked on the east side of North Sherman Boulevard, parked shortly, but drove away. At 1:23PM, a male walked from the south on the city sidewalk, walked towards the front door of the 5237 North Sherman Boulevard #1, and entered. At 1:27PM, the male exited the target house, with his right-hand fingers curled up as if to be carrying a small item and secured that item in his right pant pocket. The male walked back southbound away from the house. At 1:36PM, a black 2016 Nissan Versa (WI BAP8933, VIN 3N1CN7AP0GL906829) arrived and parked in front of 5237 North Sherman Boulevard #1 with a driver and front passenger. A DOT check showed that Precious S. Jackson (DOB: 01/04/1987) of 5468 North 53rd Street (Milwaukee, WI) registered the Nissan. The front passenger exited carrying gloves in her left hand, walked to the front door of 5237 North Sherman Boulevard #1, and entered at 1:37PM. At 1:37PM, the woman exited wearing only one glove on her right hand, carrying the other glove in her right hand and appeared to be carrying a small item in her left hand – the woman's palm was facing upward, and her fingers were

7

closed in a fashion consistent with securing a small item in her palm. She entered the Versa and they drove away. At 1:53PM, the same black Lexus sedan returned with the same occupants. The front passenger woman exited the front passenger seat, walked to 5237 North Sherman Boulevard #1, knocked on the same front south window and was allowed in at 1:54PM. At 1:55PM, the woman exited the front door, walked to the Lexus and they drove away. At 2:07PM, the neighbor woman in the brown robe exited her residence, walked and entered 5237 North Sherman Boulevard #1 at 2:08PM. At 2:09PM, she exited the front door of 5237 North Sherman Boulevard #1, walked back to her house and entered.

13.     Officer Newport knows from experience that drug houses are established for multiple reasons to include sales, manufacturing, and/or stashing. Officer Newport observed that all the occupants (aside from the single instance wherein a woman carried a black bag, but left it at the target house) were not carrying anything large to and/or from 5237 North Sherman Boulevard #1. Officer Newport knows that drugs are easily concealed in clothing. Based on the frequent quick visits from vehicles, neighbors, and on foot, Officer Newport believed that these visits were for the purpose of buying drugs from 5237 North Sherman Boulevard #1; this is also supported by the anonymous concerned citizen reporting 5237 North Sherman Boulevard #1 as a drug house. From experience, Officer Newport knows that drug houses can supply their neighborhood, making it convenient for drug users to purchase their product locally. The examples of this are: the neighbor woman in the brown robe that repeatedly walked to her neighbor's house (5237 North Sherman Boulevard #1) for short times and returned home; the male that approached on foot in the middle of a cold high wind day for another suspected purchase; and the Nissan Versa which is registered a mile away from 5237 North Sherman Boulevard #1. Additionally, the first

8

suspected purchase with the woman was when Brian Brown was present at the location. Officer Newport knows from experience that drug dealers can secure larger amounts of controlled substances inside of drug houses for safe keeping, leave in vehicles and return to the drug house to restock for more street-level distribution. Brian Brown appeared to have free access to the residence, including leaving and returning to grab his can of soda that was left inside of the residence. When Brian Brown leaves, there is someone left at the residence who controls the residence and suspected sales. When Brian Brown left, he closed the door behind him. Others must knock or have the door open for them when they approach the residence. Officer Newport reviewed the surveillance photos that Officer Newport took and observed that others wait to have the door opened for them, unlike Brian Brown who exercises the power to open the door himself.

14. Officer Newport conducted a criminal history check of Brian Brown. Officer Newport observed Brian Brown is a convicted felon. In Milwaukee County court case 1998CF003284, Brian Brown was convicted of 961.41(1m)(cm)1 (Possession with Intent to Deliver-Cocaine). In Milwaukee County court case 2000CF003829, Brian Brown was convicted of 961.41(1m)(cm)2 (Possession with Intent to Deliver-Cocaine). In Waukesha County court case 2007CF000628, Brian Brown was convicted of 961.41(3g)(c) (Possession of cocaine). In Waukesha County court case 2010CF000107, Brian Brown was convicted of 961.41(3g)(c) (Possession of cocaine). In Waukesha County court case 2013CF000889, Brian Brown was convicted of two counts of 961.41(1m)(cm)1r (Manufacture/Deliver Cocaine) as a Conspiracy.

15. Officer Newport watched 5237 North Sherman Boulevard #1 (Milwaukee, WI). At 1:24PM, a Fedex delivery truck delivered a package to the house. At 1:25PM, an older black male

9

exited the front door of the house, grabbed the package, and took it inside. At 1:41PM, a woman arrived and removed a folding chair and blue bag from the car and took it inside of the house.

16. On December 31, 2025, Officer Newport watched 5237 North Sherman Boulevard #1, as part of a drug investigation. As Officer Newport arrived at the house at 9:20AM, Officer Newport observed a black male standing on the porch, knocking on the south front window (common window that others knock on to gain entry). The man did not get any response and called someone. Eventually the door was opened for the man and he entered. At 9:25AM, the man exited and re-entered, ultimately leaving at 9:27AM, walking southbound away from the house. At 12:39PM, a woman approached the front door, knocked and waited. The woman was allowed inside. At: 12:40PM, a male approached on foot, stood outside and waited. As the woman exited at 12:41PM, the male then entered the front door. At 12:41PM, the male then exited the front door and walked away. At 1:44PM, a black Nissan Versa parked in front of the residence. The woman was the front passenger, and male was the driver. The woman exited, walked to the front door, and was allowed inside. At 1:45PM, the woman exited the front door, entered the Nissan and the male drove them away.

17. On January 3, 2026, Officer Newport watched 5237 North Sherman Boulevard #1, as part of a drug investigation. At 11:50AM, a black Nissan Versa arrived with a woman as the front passenger, and a man as the driver. The woman exited, walked to the front door, knocked and was allowed in at 11:51AM. At 11:52AM, the woman exited the house, walked to the Nissan and they drove away.

18. On January 3, 2026, Officer Newport watched 5237 North Sherman Boulevard #1, as part of a drug investigation. At 11:50AM, a black Nissan Versa arrived with a woman as the

10

front passenger, and a man as the driver. The woman exited, walked to the front door, knocked and was allowed in at 11:51AM. At 11:52AM, the woman exited the house, walked to the Nissan and they drove away.

19.    On January 4, 2026, a Milwaukee County Court Commissioner granted Officer Newport a dog sniff warrant to enter the curtilage and sniff the front door to 5237 North Sherman Boulevard, Unit 1.

20.    On January 4, 2025, Officer Newport watched 5237 North Sherman Boulevard #1, as part of a drug investigation. At 12:16PM, Cedric Strickland walked to the front door, arriving from an unknown location. Strickland unlocked the front door and entered. At 12:22PM, Strickland left the house and walked to the neighbor's house at 5233 N. Sherman Bl. At 12:57PM, while Strickland was away, a man approached the front door. The man knocked on the front door and waited. No one answered. The man knocked on the front south window. No one answered. The man opened the screen door and knocked on the main door. No one answered. The man waited but left because there was no answer. Based on Strickland not being at home, a suspected drug customer knocking and not receiving an answer, and the totality of the previous surveillance operations, I believe that Strickland is the primary occupant/distributor from 5237 N. Sherman Bl. 1. At 1:06PM, Strickland returned to the house, unlocking the front door. At 2:22PM, a woman arrived in a 2017 Jeep Cherokee (WI AAP-1057, VIN 1C4PJMCB4HD230449). A DOT showed that Bartholomew Jones (DOB: 10/18/1964) of 6140 W. Leon Ter. (Milwaukee, WI) and Alisha G. Jones (DOB: 11/02/1963) of 6140 W. Leon Ter. (Milwaukee, WI) registered the Jeep. Strickland provided money to the woman and went back inside of the house.

11

21. On January 6, 2026, at approximately 11:00PM, Milwaukee Police Officer Kaonnie Whitley informed Officer Newport of a "positive alert" of 5237 N. Sherman Bl., Unit 1. Officer Whitley provided Officer Newport with the following credentials of Officer Whitley and his K9: Police Officer Kaonnie Whitley of the Milwaukee Police Department's Specialized Patrol Division (SPD) is the current handler of the Drug Detection Canine "THOR" and that Police Officer Kaonnie Whitley and "THOR" have received six weeks (200 hours) of intensive training and certification through Shallow Creek Kennels which certifies their canine teams via the standards set by the North American Police Work Dog Association (NAPWDA), deploying and utilizing a drug detection canine; that this certification is based on guidelines set forth by the Working Group on Dog and Orthogonal Detector Guidelines which is a nationally based group in partnership with local, state, federal and international agencies including private vendors, law enforcement and first responder; that this training establishes consensus-based best practices for the use of detection canine teams by improving the consistency and performance of deployed teams which will improve interdiction efforts as well as courtroom acceptance; Shallow Creek Kennels is owned and operated by John Brannon which has been training and certifying Drug Detection canines since 2004. John was a canine handler for 22 years in which he ran 5 dual purpose canines over the course of his canine career. John is a Master Trainer for NAPWDA. Shallow Creek Kennels under John's guidance has certified over a thousand canine teams since 2004. Annually the Milwaukee Police Department Canine Unit goes through a rigorous NAPWDA certification conducted by NAPWDA Master Trainer Robert Badertscher; to include Drug Detection Canine "THOR". Robert has over 24 years as a handler and trainer for the Joliet Police Department in Illinois. Since 2017, Robert has been certifying canine teams in patrol and drug detection across

12

the United States. Since 2020, Robert has certified over one hundred canine teams annually in patrol and drug detection. Police Officer Kaonnie Whitley is the current handler of the Drug Detection Canine "THOR" and that "THOR" is trained to detect the odor of controlled substances; that these substances include marijuana, cocaine, heroin, methamphetamine, etc., as well as other dangerous drugs due to chemical processing similarities; that upon location of the odor of these controlled substances, the dog's behavior will change; that the dog is trained to come to a passive final response by sitting, standing or laying down while staring at the source of the odor; that this final response is called an "Indication"; furthermore, this final response or "Indication" may also indicate items recently contaminated with, or associated with, the odor of one or more of the controlled substances; according to Police Officer Kaonnie Whitley, the current handler of the Drug Detection Canine "THOR", that when a dog is trained to detect a substance that it learns to discriminate the odor vapor of that substance from other odors in the environment by reacting to the compound(s) that best help it earn reinforcement from the drug detection canine handler; that with sufficient training, the compound(s) whose detection most often results in reinforcement becomes the "odor detection signature"; Police Officer Shawn Burger of the Milwaukee Police Department's Specialized Patrol Division is currently the head trainer for the Milwaukee Police Department since 2018. Police Officer Shawn Burger is a member of the United Stated Police Canine Association (USPCA), North American Police Work Dog Association (NAPWDA), and Wisconsin Law Enforcement Canine Handler Association (WLECHA). That Police Officer Shawn Burger is the current handler of the Drug Detection Canine "APOLLO" and that he has attended numerous seminars as well as a 320-hour course of intensive training on the deployment and utilization of a Drug Detection Canine through the Steinig Tal Kennels and Fox Valley Technical

13

Institute in Campbellsport, Wisconsin; that Police Officer Shawn Burger has been involved with the training and certification of other drug detection canines for the Milwaukee Police Department as well as other law enforcement agencies within the State of Wisconsin and has trained and certified at least one hundred (100) drug detection canine teams for said agencies. In 2019, Police Officer Shawn Burger completed the United States Police Canine Association (USPCA) 480 hour "Basic Patrol Dog and Narcotic Instructor's Course" conducted by the Saint Paul Police Department Canine Unit. Police Officer Shawn Burger, as Senior Canine Handler for the Milwaukee Police Department, maintains an ongoing training regimen with the other drug detection canine teams for the Milwaukee Police Department which includes Police Officer Kaonnie Whitley and his Drug Detection Canine "THOR". According to Police Officer Kaonnie Whitley, that his Drug Detection Canine "THOR" has detected controlled substances more than "100" times in the past which included training; that "THOR" alerts have been the basis for zero (0) search warrants and more than seventy-five (75) searches of motor vehicles; that in each alert, drugs that "THOR" is trained to find have been recovered or a drug nexus has been found; that the canine has been used in these motor vehicle searches and in the execution of search warrants in the past and that during these searches the canine has found controlled substances for the officers resulting in the arrest and issuance of charges against these individuals with several cases pending in Court;

22.    On January 8, 2026, the Honorable Susan Roth granted Officer Newport a residential search warrant for 5237 N. Sherman Bl. #1. On January 9, 2026, Special Agents and Task Force Officers from ATF, Officers from the Special Investigations Division and Tactical

14

Enforcement Unit of the Milwaukee Police Department served the search warrant at 5237 N. Sherman Bl. #1.

23. During the warrant service, Officers found a target in the house. It was determined that the suspect was not Cedric Strickland, but Kenneth Wade (black male, 11/11/1956). When Officer Newport observed Wade, Officer Newport recognized that Wade was the person that Officer Newport observed on surveillance and was not Strickland. Officers searched the house. Officers from TEU told Officer Newport that when taking Wade into custody in the living room and having him sit down while the rest of the house was cleared, Wade refused to sit in a particular location. Wade informed Officer that there was a firearm on the couch. Officers found a black Smith and Wesson Equalizer 9mm pistol (S/N PJW1283), loaded with twelve (12) cartridges and affixed with a red dot that was inside of a Kydex holster in the couch along the south wall. Wade informed Officers of the whereabouts of the firearm, showing knowledge of the firearm. Wade was the only person in the house. When Officer Newport learned of the positive suspect identification of Wade, Officer Newport entered the house and asked Wade if he was a felon. Wade confirmed he was a felon from a long time ago, showing knowledge that he was a convicted felon. Wade said that he had lived at the residence for approximately one (1) year, which is accurate, because the Milwaukee Police Body Worn Camera where the occupant called 911 on Wade was on January 8, 2025. Officer Sean Patrick searched the kitchen. Officer Patrick found a blue Weighmax digital scale with white powdery residue (suspected cocaine) on the scale, inside of the north kitchen cabinet on the top shelf. On top of the fridge in the kitchen was a large roll of plastic wrap that was found in the room with the sealer. Officer Miguel Ortega helped search the living room. Officer Newport found a box of sandwich bags on the middle shelf of the TV stand with

15

unused sandwich bags inside. Officer Newport found a black Weighmax digital scale with white powdery residue (suspected cocaine) inside of the box of unused sandwich bags. Officer Newport found a black cell flip phone on the TV stand, near the scale. Officer Newport later requested consent from Wade to search through his phone, which Wade provided consent to search his cell phone. Officer Newport reviewed, photographed and videoed the phone of its contents. Officer Newport provided the phone back to Wade. Officer Newport found a red plate with Kenneth Wade's ID card on it, along with a razor blade and white powdery substance on the plate under the couch near the front. Officer Newport knows from experience that drug dealers commonly use some type of stable surface to cut and package drugs for sale. Officer Raynaldo Roman searched the northeast bedroom (which had an air mattress and dresser inside). The door had a padlock on it, which Wade had a key to open the padlock to the door. Officer Roman found a stainless steel Potane vacuum sealer that was covered in white powdery residue (confirmed by Nark 07 to be suspected cocaine). Later after the sealer was placed on Milwaukee Police inventory, the sealer was provided to the Milwaukee Police Forensics Unit for latent print collection. Inside of the same tote that had the sealer, there was mail for Kenneth Wade, along with scissors, plastic wrap, packaging tape and vacuum seal bags. In Officer Newport's experience, people involved in larger weight drug sales will commonly use a press or sealer to compress large weights of narcotics. Officer Newport has observed left-over residue of the substance that the dealer has compressed leftover on the tool. Due to the presence of cocaine, plastic wrap, packaging tape, scissors, and bags, Officer Newport believes that the sealer was used to package large volumes of cocaine. Inside the dining room, there was Wade's jacket that Officer Newport observed Wade wearing one day during surveillance. Inside of the jacket pocket was Wade's wallet with Wade's materials

16

inside. Also, inside of the house, there were medications for Wade and Wade admitted to living at the house.

24.     After the search warrant was concluded, Officer Newport interviewed Wade. Wade stated he purchased cocaine from a supplier, "Brian Jones" ("SOS"), black male, 40 years old, 6'00, 200 pounds, low haircut, light skin complexion, for approximately one (1) year (close to the physical description of Brian Brown). Wade was purchasing 1-3 ounces approximately 3 times a month from "Jones". "Jones" drove a brown Chrysler Town and County Minivan (Brian Brown drove a Honda Odyssey minivan) with registration plates on it. Wade was unable to provide a phone number for "Jones" because Wade spoke with "Jones" two weeks ago, but Wade changed phones (confirmed by review of call log which showed earliest calls on December 29, 2025). Wade personally observed "Jones" with cocaine in the past, personally purchasing cocaine from "Jones" and observed "Jones" in possession of multiple ounces of cocaine at one time. Wade personally observed "Jones" with a duffle bag, knowing that "Jones" mixes up the cocaine and packages it and conceals it inside of a duffel bag for travel; Wade's knowledge of this was personally observed by "Jones" using the northeast bedroom where the vacuum sealer and large-scale packaging equipment was seen. Wade and "Jones" had two keys for the padlock that locked the door to packaging room. For disclosure, Wade was initially arrested during the execution of the search warrant but was released from custody and interviewed in a debrief setting to identify Wade's cocaine supplier. Wade voluntarily wished to cooperate with law enforcement for charging/sentencing consideration on two felony charges, Felon in Possession of a Firearm and Maintaining a Drug Trafficking Place. Based on Wade's statements, Officer Newport recognizes that this investigation is a cocaine trafficking conspiracy. Officer Newport knows that drug dealers

17

will use/employ other drug dealers and users to further drug distribution. Based on Wade's interview, Wade and his cocaine supplier are conspiring to distribute cocaine together. Wade admitted to selling 1-3 ounces a month over the last year; Wade's total amount of cocaine distribution by his admission would equate to 336 grams to 1,008 grams of cocaine sold annually by Wade. At the time, Officer Newport did not have anything to dispute Wade's claims of someone other than Brian Brown being the supplier and started searching for a Brian "Jones" in law enforcement databases.

25. On January 12, 2026, ATF Special Agent Matthew Bammert and Officer Newport interviewed Wade. Wade would call his cocaine supplier using Wade's cellular phone number of 414-766-8435. Wade's cocaine supplier would commonly send another dealer to deliver cocaine to Wade (furthering a drug conspiracy of cocaine). Officer Newport asked Wade if that was the only number that Wade would use to contact his cocaine supplier and Wade confirmed that it was.

26. Wade did not have the number for his cocaine supplier, because Wade said that he had a new phone recently (call logs showed earliest calls 12/29/2025). Wade provided his phone number as (414) 766-8435. Wade told me that Wade would call the supplier from (414) 766-8435. Working with DEA TFO Robert Gregory, TFO Gregory sent an administrative subpoena to T-Mobile to obtain cell records for (414) 766-8435. TFO Gregory sent Officer Newport the results and Officer Newport analyzed Wade's phone records.

27. On January 13, 2026, Crime Scene Investigator Whitney Miller processed the vacuum sealer that Officer Newport seized as evidence during the search warrant at 5237 N. Sherman Bl. #1. CSI Miller processed the sealer for latent prints and recovered six (6) latent prints. On February 6, 2026, Latent Print Examiner Chet St. Clair reviewed the latent prints recovered by

18

CSI Miller; LPE St. Clair identified two of the latent prints as Brian D. Brown (black male, 05-18-1973), right middle finger and right ring finger on the Potane vacuum sealer.

28.     Based on the investigation, interview with Wade, and identification of Brian Brown's fingerprints, Officer Newport believes that Wade was intentionally withholding information regarding Brian Brown being Wade's supplier; therefore, Wade provided false information to Officer Newport to mislead Officer Newport in not identifying Brian Brown as his supplier. Officer Newport believes that that Wade was providing truthful information involving Wade's cocaine distribution, based on the physical surveillance and what was recovered in the house. Officer Newport believes that Wade was protecting his cocaine supplier by altering Brown's last name and vehicle that Brown was driving to protect Brian Brown. Officer Newport informed the Milwaukee County District Attorney's Office that Wade lied to Officer Newport and wished to move forward with prosecution if the District Attorney agrees to criminally charge Wade.

29.     On February 10, 2026, after discovering that Brian Brown's latent prints were identified on the vacuum sealer seized from 5237 N. Sherman Bl. #1, Officer Newport conducted surveillance of Brian Brown's reported residence at 3367 N. 50th St., Milwaukee, Wisconsin. Officer Newport saw that Brian Brown's Honda Odyssey was not parked at the house, but there was a newer blue 2019 Dodge Ram (WI WM9948, VIN 1C6SRFJT4KN585835) parked in front of the house ("subject vehicle"). A DOT check showed the Dodge Ram was registered to Savannah F. Brown (DOB: 12-28-1999), to 3367 N. 50th St. Officer Newport has never seen this vehicle before parked at the residence in the past. Officer Newport searched through a Law Enforcement database and saw that the subject vehicle was recently parked at the residence on 02/04/2026 and

19

02/09/2026. Officer Newport had to leave for an unrelated operation, but when Officer Newport returned at 11:25AM, Officer Newport observed that the subject vehicle was gone. At 11:48AM, Officer Newport observed the subject vehicle approach North 50th Street and West Townsend Street. Officer Newport observed that Brian Brown was driving the subject vehicle. Brown continued southbound, passing his house and out of Officer Newport's view. At 11:53AM, Brown walked onto the curtilage of 3367 North 50th Street, used a key to unlock the front door, and entered the residence.

30. On February 18, 2026, the Honorable United States Magistrate Judge William Duffin granted Officer Newport a warrant to place a GPS tracker onto Brian Brown's Dodge Ram pickup truck.

31. On February 20, 2026, Officer Newport, along with ATF TFO Paul Martinez, ATF TFO Evan Domine, ATF TFO Katherine Stewart, FBI TFO Miguel Ortega, ATF SA Anthony Winkler, ATF SA Luke Barker, and ATF SA Matthew Bammert conducted a GPS tracker deployment operation at 3367 North 50th Street. Officer Newport placed the GPS tracker onto Brian Brown's Dodge Ram. *Note: Prior to tracker deployment date, TFO Newport checked the house to make sure the vehicle was located at the residence on February 17, 2026, February 18, 2026, and February 19, 2026. TFO Newport observed that Brian Brown's Dodge Ram was parked on the street in front of the residence or near the front of the residence.*

32. On February 20, 2026, TFO Newport conducted physical surveillance aided by electronic surveillance of Brian Brown, noting the following. At 11:14AM, TFO Newport saw that the Dodge Ram was mobile, drove directly to and parked in the area of 3261 North 34th Street (Milwaukee, WI) at 11:18AM. TFO Newport physically watched the Dodge Ram. At 12:32PM,

20

TFO Newport saw Brian Brown walking off of the front porch of 3255 North 34th Street, with a suitcase. TFO Newport watched Brian Brown open the front gate, walk towards his Dodge Ram and place the suitcase into the bed of the Dodge Ram. Brian Brown entered the Dodge Ram and drove away. Brian Brown drove directly home to 3367 North 50th Street (Milwaukee, WI). TFO Newport arrived to the area and observed the Dodge Ram was parked unoccupied. A short time later, TFO Newport saw Brian Brown walk off of the front door area of his house, enter the Dodge Ram, and drive away. TFO Newport followed Brian Brown until he stopped in the area 4923 West Center Street (Milwaukee, WI). At 12:50PM, TFO Newport saw Brian Brown standing outside of 4923 West Center Street (Milwaukee, WI) ("Icon Barbershop") talking on a cell phone. Brian Brown entered the barbershop. At 12:57PM, Brian Brown exited the barbershop, entered the Dodge Ram and drove away. TFO Newport followed Brian Brown to an autobody shop, located at 8341 West Lisbon Avenue (Milwaukee, WI) ("T&C Auto Sales and Repair LLC"). TFO Newport was positing for surveillance and saw that there was a front passenger inside of Brian Brown's truck, along with a driver (believed to be Brian Brown). At 1:10PM, TFO Newport saw a black male appear from around the front of the truck and walked towards the body shop. Brian Brown reversed out of the car lot and drove away back to the barbershop. At 1:29PM, a white Ford Escape, bearing a Pennsylvania registration plate of "DPF818," arrived. At 1:29PM, a woman exited the driver door, walked to and entered the barbershop. At 1:30PM, she exited the barbershop, entered the Ford Escape and drove away. At 1:39PM, a black Cadillac Escalade parked in front of the barbershop and loitered. At 1:58PM, two occupants exited the Cadillac, walked to, and entered the barbershop. At 2:07PM, Brian Brown left the barbershop, entered the Dodge Ram, and drove away. TFO Newport saw that the Cadillac Escalade registration plate was 34538RA.

21

Brian Brown drove eastbound but made travel changes and drove all the way back westbound until arriving back at the T&C Auto Sale and Repair LLC (body shop) at 2:30PM. Brian Brown parked in the same location, did not exit his car, and appeared to speak with another worker of the body shop. At 2:45PM, Brian Brown reversed and left the area. TFO Newport stopped following Brian Brown and watched the body shop until 3:00PM. TFO Newport then terminated physical surveillance of Brian Brown.TFO Newport monitored electronic surveillance of Brian Brown and saw that Brian Brown went to McDonald's at 7451 West Appleton Avenue (Milwaukee, WI) and then returned home to 3367 North 50th Street. At 5:04PM, Brian Brown drove to 3154 North 27th Street (Milwaukee, WI) for 7 minutes and then drove into the alley behind 2950A North 26th Street (Milwaukee, WI).

33.     A check of the GPS for February 21, 2026, and February 22, 2026, showed no activity. TFO Newport checked the registration plates that were seen on surveillance. A DOT check of DPF818 did not show any vehicle associated.

34.     A DOT check of 34538RA showed that the Cadillac Escalade is registered to a black 2023 Cadillac Escalade SUV (VIN 1GYS4KKL4PR451951), to Yvette J. Harvey (black female, 01-30-66), of 10420 West Birch Avenue (Milwaukee, WI). Harvey reported that as her address since 10-07-2006. Based on the physical description of Harvey (5'02 / 160 pounds), TFO Newport believes that Harvey was the front passenger of the Cadillac. A check of Law Enforcement records showed that Larry D. Harvey (black male, 08-27-1956) reported to live at 10420 West Birch Avenue. TFO Newport looked at Larry Harvey's WI DOT photo and believes that Larry Harvey was the driver of the Cadillac.

22

35. TFO Newport searched Law Enforcement records 3255 North 34th Street. TFO Newport observed that Kenneth M. Wade (black male, 11-11-1956) reported living at 3255 North 34th Street in 2023. *Based on Kenneth Wade's involvement in cocaine distribution and association with another address that Brian Brown frequents, TFO Newport suspects that this address is also associated with cocaine distribution.*

36. TFO Newport searched Law Enforcement records related to 4923 West Center Street. TFO Newport saw that multiple businesses are reported under the same address, with the most recent being "Epiphany Salon Lash", with four (4) other business reported at the location to include: "Big Shots Beauty Supply", "Will Smith", "Smoke Connection" and "Trend Fashion".

37. TFO Newport searched Law Enforcement records related to 8341 West Lisbon Avenue. T&C Auto Sales and Repair LLC showed the Corporate Officer and Director to be Terry S. Robinson Jr. (8341 West Lisbon Avenue, Milwaukee, WI).

38. On February 23, 2026, TFO Newport watched 3255 North 34th Street, as part of a federal criminal investigation. TFO Newport saw a maroon 2007 Chevrolet Tahoe bearing a Wisconsin plate of AGW-6949 (VIN 1GNFK13017R412902) parked in front. A DOT check showed the Tahoe was registered to Supreme Investments LLC, of 600 South Maple Ave, Green Bay, WI 54303. At 2:13PM, a black Cadillac Escalade parked behind the Tahoe. At 2:21PM, a black Toyota 4Runner parked behind the Cadillac. TFO Newport saw Brian Brown exit the Cadillac, walk to the driver door of the Toyota, reach into the driver's window holding a small green object and then remove his hand from the window, carrying a different object. Brian Brown walked back to his Cadillac and entered. The Toyota drove away and TFO Newport saw the Toyota had a registration plate of 243-ZCW. A DOT check showed that car is a 2016 Toyota 4Runner

23

(VIN JTEBU5JR1G5371135), registered to Khamsay Senethavisouk (DOB: 10-30-53), of 6546 North Fresno Street, Milwaukee, WI. TFO Newport looked at Senethavisouk's WI DOT photo and saw that he was the driver of the Toyota. Senethavisouk stopped, looked down at something and then reversed back to Brian Brown. Senethavisouk stopped the Toyota and Brian Brown exited his Cadillac and walked towards the trunk of his car. Senethavisouk exited his Toyota and went into the rear passenger compartment, walked around and went towards the area that Brian Brown was located. Senethavisouk walked back towards the rear passenger compartment door on the driver side and TFO Newport saw Senethavisouk manipulating a large black duffle bag in the rear passenger seat. Senethavisouk moved the bag over towards the center of the back seat, closed the rear passenger door and drove away in the Toyota. Brian Brown entered his Cadillac and drove away behind Senethavisouk. TFO Newport knows from previous surveillance that Brian Brown has a Cadillac that he leaves parked in front of his residence. TFO Newport reviewed previous surveillance and saw that Cadillac parked at the residence on December 30, 2025, and February 10, 2026. The Cadillac has a Wisconsin registration plate of ARW1568; a DOT check showed that plate is not registered to any vehicle; that plate is registered to Lancha Frierson (DOB: 05-29-66) of 3367 North 50th Street. TFO Newport did not see any other activity at the residence.

39.     On February 24, 2026, TFO Newport watched Brian Brown via electronic surveillance overlapping with physical surveillance. TFO Newport saw that Brown was mobile via electronic surveillance. TFO Newport went to Brown's location, where Brown was filling up his Dodge Ram with gas at 92nd and Burleigh. Brown drove to acquire food in the area of 62nd and North Avenue and then went home. Later, TFO Newport saw Brown parked at 4549 North Houston Avenue (Milwaukee, WI). TFO Newport saw the Dodge Ram was parked to the north of

24

the house, facing east. TFO Newport watched the house. TFO Newport saw Brown exit the house through the side door, enter the Dodge Ram and drive away. TFO Newport followed Brown away from the house to a different part of the city, but Brown turned around and drove back to 4549 North Houston Avenue. TFO Newport saw that a white construction style truck/trailer parked behind Brown. A male was in the back of the truck, exited the back carrying something, and walked towards the side door of the house. TFO Newport stopped watching the house. Later, TFO Newport saw that Brown returned home. Brown left his residence at 3367 North 50th Street and drove to 3255 North 34th Street (Milwaukee, WI). TFO Newport drove to watch Brown, but saw that Brown left and drove directly to the 3200 block of North 27th Street. TFO Newport watched Brown, who parked his Dodge Ram on the west side of North 27th Street in the 3200 block. TFO Newport saw a black male wearing all black jogging across the street towards Brown, but stopped, turned around and walked back towards a white SUV that was parked on the east side of North 27th Street, facing north. The black male then walked back across the street and entered the front passenger seat of Brown's Dodge Ram. They remained there for approximately one minute and then drove away together (TFO Newport saw Brown was driving). When Brown drove away, TFO Newport obtained the license plate of the white SUV that the front passenger walked towards. TFO Newport identified the vehicle as a white 2024 Buick Encore, bearing a Georgia registration plate of CIF4576 (VIN KL4AMDSL6RB218091). Brown drove them to the 2800 block of North 28th Street (Milwaukee, WI) and parked on the west side of North 28th Street. TFO Newport entered the block travelling southbound. There was traffic congestion and two people walking across the street from the east side of North 28th Street. The pedestrians were walking together, one wearing a bathrobe in winter and another wearing a black jacket. The two pedestrians walked to the front

25

passenger window of Brown's Dodge Ram. TFO Newport initially saw that the woman in the bathrobe extended her hand out to the window and the front passenger of the Dodge Ram handed something to the woman. The woman began walking away. TFO Newport arrived at the driver door of the Dodge Ram and could see Brown was in the driver seat, looking towards the front passenger area where the suspected drug deal was taking place. As TFO Newport passed the vehicle, TFO Newport saw that the black male in the black jacket had his hand extended and the front passenger placed something into his hand, then the black male in the black jacket walked away. Due to positioning and timing, TFO Newport was unable to capture this transaction by photograph, but attempted to take a picture of the people walking by using the rear-view mirror. TFO Newport obtained one photograph of the side profile of the black male wearing the black jacket walking away from the Dodge Ram. Brown drove away with the front passenger. TFO Newport followed Brown to the southside of Milwaukee to the parking lot of Rozga Funeral & Cremation Services (4309 South 20th Street, Milwaukee, WI). TFO Newport saw Brian Brown and the front passenger walking together and enter Rozga. A short time later, they exited together and left in the Dodge Ram. TFO Newport then terminated surveillance.

40. TFO Newport remembered seeing the front passenger's white Buick in past surveillance. TFO Newport reviewed surveillance photos from a surveillance session on February 20th, 2026, at 3255 North 34th Street. TFO Newport took a surveillance photograph of the same white Buick that was parked directly behind Brian Brown's Dodge Ram. During surveillance, nobody came and went from the Buick related to 3255 North 34th Street, which now causes TFO Newport to believe that person was inside of 3255 North 34th Street with Brian Brown and remained behind after Brown and TFO Newport left.

26

41.     On February 24, 2026, SA's and TFO's from ATF-Milwaukee conducted a trash pull at 3255 North 34th Street, as part of an ongoing federal investigation. ATF TFO Katherine Stewart, ATF SA Matthew Bammert, and ATF SA Luke Barker watched the residence prior to the trash pull. ATF TFO Paul Martinez, ATF TFO Evan Domine and ATF TFO Jonathon Newport drove through the alley to the trash bins that were located outside of the walkway to the alley behind 3255 North 34th Street (Milwaukee, WI). TFO Domine and TFO Newport grabbed multiple bags from the trash bins and one box from the recycling bin. TFO's transported the trash to MPD's PAB (749 West State Street, Milwaukee, WI) to look through the trash and found the following: ail parcel addressed to Vonasia Simmons at 3257 North 34th Street, from Lindsay Sorenson from 1420 Sunset Drive, Kimberly, WI 54136, shipped 1-30-26; a medical wristband for Jesse Robinson Jr. (DOB: 12-26-1968) from 2-19-26; mail parcel addressed to Vonasia Simmons at 3257 North 34th Street, from Mallory Boarts from 59 Wildes District Rd, Kennebunkport ME 04046; shipped 2-12-26' ,ail addressed to Gigi Q. Simmons at 3257 North 34th Street Upper, from Way2Go Card Payment Solutions; mail parcel addressed to Vonasia Simmons at 3257 North 34th Street, from Aloura Garcia from 10331 Coventry Ct, Boca Raton FL, 33428, shipped 1-26-26; and a DOT check of Robinson showed that Robinson lives at 3261 North 34th Street (Milwaukee, WI), which is the neighbor's residence. TFO Newport did not locate any trash or evidence addressed to 3255 North 34th Street.

42.     On February 25, 2026, TFO Newport and ATF Special Agent Matthew Bammert followed/watched Brian Brown in Milwaukee, WI. TFO Newport and SA Bammert used electronic surveillance overlapping with physical surveillance of Brown. Case agents observed Brown was on the south side of Milwaukee. Case agents found Brown at the McDonald's near 27th

27

and National. Case agents followed Brown, where Brown parked and appeared to eat his food. Brown drove to his house at 3367 North 50th Street and was there briefly before leaving. Case agents suspected that Brown was going to the suspected stash house located at 3255 North 34th Street, based on Brown's route. Case agents observed Brown park in front of the residence and walk towards the front door. TFO Newport watched Brown through binoculars and taking photographs of Brown. TFO Newport saw Brown holding and manipulating keys in a fashion as if someone was trying to locate one specific key for a door on his key ring. Brown did that while walking towards the front door of 3255 North 34th Street. Based on that, TFO Newport suspects that Brown has a key to open the door to 3255 North 34th Street, Milwaukee, WI; this action shows a level of control over the residence. Case agents waited for Brown to leave. Brown eventually left the residence and drove away in his Dodge Ram. Case agents followed Brown to the 4500 block of North 31st Street (Milwaukee, WI). Case agents did not see where Brown walked towards, but saw the Dodge Ram was unoccupied. Case agents set up on the Dodge Ram and after approximately ten (10) minutes, Brown appeared from the west side of North 31st Street. Case agents noted that there were apartment doors at 4575 North 31st Street (Milwaukee, WI) and case agents suspected that Brown came from one of those doors based on how quickly Brown appeared in the middle of the street to enter his Dodge Ram. Case agents followed Brown back to 3255 North 34th Street. Brown exited and walked to the house. After a short time, Brown exited the house, entered the Dodge Ram and drove away. Case agents watched Brown through electronic surveillance, where Brown returned home to 3367 North 50th Street.

43. Based on the frequency of Brown coming and going from 3255 North 34th Street; Jamaar Kendick's Buick parked in front of the residence; Brown's travel to the location, then to

28

pick up Jamaar, then conducting hand-to-hand drug sales; case agents knowledge that Brian Brown uses residences that he does not live at to package and sell from; case agents believe that 3255 North 34th Street is Brian Brown's new "stash" house (equivalent to using Kenneth Wade's house for packaging, storage, sales).

44. On February 25, 2026, TFO Newport searched through Law Enforcement records to identify the co-conspirator that was with Brian Brown on February 24, 2026. TFO Newport checked where the Buick Encore that was parked in front of 3255 North 34th Street on February 20, 2026, and the co-conspirator walked towards on February 24, 2026. TFO Newport observed that on February 17, 2026, that car was parked at 3243 North 27th Street and in the 3200 block of North 27th Street on January 12, 2026. On December 4, 2025, the Buick was parked in front of 9520 West Capitol Drive. The most frequented parking location was in the 2100 block of West Michigan Avenue (Milwaukee, WI). TFO Newport saw the Buick parked there on January 7, 2026, January 8, 2026, January 9, 2026, January 20, 2026, January 30, 2026.

45. TFO Newport searched throughout the United States for any information involving the Buick travelling out of Wisconsin. TFO Newport saw that the Buick was in Milwaukee on February 4, 2026. TFO Newport saw that the Buick was in Texas in February 2026. TFO Newport saw the Buick was at 10009 US-59, Nacogdoches TX 75964 on February 6, 2026 at 5:47:06 (CST). On February 6, 2026, at 7:19:05AM (CST), the Buick was at 14344 US-59, Shepherd, TX 77371. On February 6, 2026, at 7:58:56AM (CST), the Buick was at 5703 Eastex Fwy, Houston, TX 77026. On February 7, 2026, at 8:10:58AM (CST), the Buick was at 21590 US-59, New Caney TX 77357. On February 7, 2026, at 9:52:27AM (CST), the Buick was at 10009 US-59, Nacogdoches, TX 75964 (same location as on February 6, 2026). TFO Newport saw that on

29

February 6, 2026, the movement was in a southbound direction; the February 7, 2026, movement was in a northbound direction (showing a one day turn around). On February 11, 2026, TFO Newport saw that the Buick was in Milwaukee, WI. TFO Newport believes that based on the surveillance, along with the information of a one day turn around in Texas, that this is consistent with a "run" (drive to pick up narcotics and transport them interstate).

46. TFO Newport conducted another law enforcement system check of the Buick. On February 5, 2026, at 1:39:27PM (CST), the Buick was located on Ryan Road at I-94. On February 7, 2026, at 5:34:29PM, the Buick was located in Pocahontas, Arkansas at Highway 67 and Route 304. On February 7, 2026, at 6:21:01PM (CST), the Buick was located in Neelyville, Missouri on U.S. Highway 67. On February 7, 2026, at 6:28:35PM (CST), the Buick was still located in Neelyville, Missouri on U.S. Highway 67. On February 7, 2026, at 6:52:24 (CST), the Buick was located in Poplar Bluff, Missouri, on Highway 60. On February 7, 2026, at 8:12:09PM (CST), the Buick was located in Wyatt, Missouri (located at the southern Illinois border). On February 8, 2026, the Buick was in Milwaukee.

47. Based on the location of the Buick in Milwaukee and where Brian Brown picked up the unknown co-conspirator, TFO Newport conducted a check through MPD's records for any subjects reported to be residing at 3243 North 27th Street (Milwaukee, WI). TFO Newport saw that Jamaal M. Kendrick (black male, 05-22-83) reported to reside at that address. TFO Newport reviewed the surveillance photographs of the front passenger and compared that to Kendrick's MPD booking photo and Wisconsin Driver's License photo to identify that the co-conspirator is Jamaal Kendrick. A criminal history check revealed that Kendrick is convicted felon. In

30

Milwaukee County court case 19CF4775, Kendrick was convicted of 961.41(3g)(c) (Possession of Cocaine), a class I felony.

48. On February 28, 2026, TFO Newport reviewed a Milwaukee Police homicide incident that occurred on February 10, 2025. Officer Kaonnie Whitley canvassed houses for witnesses/video surveillance. Officer Whitley spoke with Jamaal Kendrick at the side door of 2950 N. 26th St., because there were cameras on the house. Kendrick told Officer Whitley that the cameras were on the house when he moved there. Kendrick provided his name and birth date. When Officer Whitley asked for Kendrick's phone number, Kendrick said he does not have a phone. TFO Newport watched the body camera and identified that Kendrick was the person talking to Officer Whitley, who is the same person that TFO Newport saw with Brian Brown during surveillance.

49. TFO Newport remembered reviewing Brian Brown's GPS data, which showed that Brown was parked 2950 N. 26th St. TFO Newport reviewed the GPS data, which showed Brian Brown parked behind that residence on February 20, 2026. Brown initially drove to 3154 North 27th Street for 7 minutes and then drove and parked behind the address 2950 North 26th Street. Brown remained at that location for two hours, three minutes and thirty seconds.

50. On February 28, 2026, TFO Newport drove to 2950 N 26th St. to conduct surveillance. There TFO Newport saw a black Buick Encore SUV (FL 99BLAA) parked in front. TFO Newport saw a multi-colored Infiniti SUV (no plates) parked in the back. TFO Newport watched the house. TFO Newport saw a dark colored Dodge Grand Caravan (WI AZY-8859) park behind the Buick. A black male, wearing a green hat, green jacket, and black pants exit and walk to the east. A short time later, the same male appeared in the street, entered the Dodge van and

31

drove away. TFO Newport checked DOT and saw that the Dodge was a Maroon 2010 Dodge Grand Caravan van (VIN 2D4RN3D19AR410965), to Emanuel E. Lewis (DOB: 10/30/1976), at 921 Jefferson St (Wisconsin Rapids, WI). TFO Newport saw a black male appear from around the back of the Buick on the east side of the street (same side as 2950 N 26th St) and enter the driver door. TFO Newport followed the Buick to 35th and North. The driver, a black male wearing a green jacket and black hat exited the driver door and entered Big Sharks Fish & Chicken. The driver exited with a brown bag, entered the Buick and drove away. TFO Newport checked DOT, which showed that the Buick had a VIN of KL4AMBSLXSB192430; the registered owner was Hertz Vehicles LLC.

51.     On March 2, 2026, TFO Newport reviewed electronic surveillance of Brian Brown between February 26, 2026 and March 2, 2026. TFO Newport saw new addresses that Brian Brown was frequenting. TFO Newport saw the following addresses that were most frequented between the 4-day period: (i) 2251 South 19th Street or 2247 South 19th Street - February 27, 2026, at 10:30AM, for twenty-six (26) minutes; February 27, 2026, at 3:32PM, for eleven (11) minutes; February 28, 2026, at 2:22PM, for thirty (30) minutes; and February 28, 2026, at 4:19PM, for eighteen (18) minutes; (ii) 2225 or 2231 North Teutonia Avenue - February 27, 2026, at 6:09PM, for three (3) hours, twenty-seven (27) minutes; February 28, 2026, at 12:01PM, for fifty-two (52) minutes; and March 1, 2026, at 3:09AM, for eight (8) hours, and eighteen (18) minutes; (iii) 3255 North 34th Street – February 27, 2026, at 12:47PM, for twelve (12) minutes; February 28, 2026, at 1:42PM, for twenty-two (22) minutes; February 28, 2026, at 3:12PM, for forty-one (41) minutes; February 28, 2026, at 5:34PM, for one (1) hour and thirty-two (32) minutes; March 1, 2026, at 11:35AM, for sixteen (16) minutes; March 1, 2026, at 1:21PM, for twenty-four (24) minutes; and

32

March 1, 2026, at 1:53PM, for twenty-three (23) minutes; and (iv) 8341 West Lisbon Avenue – February 27, 2026, at 4:20PM, for six (6) minutes; and February 27, 2026, at 5:26PM, for four (4) minutes.

52.     On March 5, 2026, TFO Newport had a pole camera installed to monitor 3255 North 34th Street (Milwaukee, WI). TFO Newport monitored the pole camera, overlapping with electronic surveillance of Brian Brown. TFO Newport saw Brian Brown arrive in the Dodge Ram. Brown walked and appeared to talk with someone at 3257 North 34th Street (upper unit), then walked to the front door to 3255 North 34th Street. TFO Newport saw Brown stop for a moment and watch southbound. Brown waited for a car to pass him before he continued to walk up to the front door (suspected counter-surveillance behavior). TFO Newport saw Brian Brown enter the front door to 3255 North 34th Street. A short time later, a white sedan parked behind Brown's Dodge Ram. A black male wearing mostly red exited the driver door. The black male walked away from the residence, until another vehicle passed him and then the black male walked to and entered the front door to 3255 North 34th Street (suspected counter-surveillance behavior). They remained in the residence for over an hour, before the black male from the white sedan exited and met someone on the front porch. The white sedan driver used a key to lock the front door of the house and spoke with the person that walked up to him. They shook hands and walked away from each other. Shortly after 12PM, another black male exited the house wearing a black hooded sweatshirt, light gray pants exited the door but did not lock it; he was holding a small white object in his right hand, looked down at it and then placed it into his right sweatshirt pocket. He walked to the north and appeared to enter the front passenger door of what TFO Newport determined was a black Toyota 4Runner, which drove away southbound after the male entered. Shortly after the white

33

sedan driver left, Brown exited the front door of the house. Brown was carrying a white package under his left arm. Brown entered the Dodge Ram and drove away. TFO Newport watched Brown (via electronic surveillance) drive to and park across the street from 4923 West Center Street ("The Barbershop"). Brown stayed at the shop for approximately thirty (30) minutes before driving home. TFO Newport reviewed tax records pertaining to 3255 North 34th Street. TFO Newport saw that "Supreme Investments LLC" from 600 South Maple Ave, Green Bay, WI, owned the house. TFO Newport conducted a search through Milwaukee Police records for 600 South Maple Ave. TFO Newport knows that the red Chevrolet Tahoe parked in front of the house was also owned by "Supreme Investments LLC" from 600 South Maple Avenue, Green Bay; in Milwaukee Police records, Gigi Q. Simmons (black female, 09/25/1979) reported that address. Additionally, Gigi Simmons reported her DOT address as 600 South Maple Avenue, Green Bay, since August 18, 2025. "Supreme Investments LLC" is reported to own the entire residence, which is 3255 North 34th Street and 3257 North 34th Street. TFO Newport's observation of Brown appearing to speak with an occupant at 3257 North 34th Street leads him to believe that there is some association between the upper and lower units. Later, TFO Newport checked the GPS location of Brian Brown and saw that Brown went to 3255 North 34th Street one time on March 5, 2026. On March 5, 2026, at 11:19PM, a small white sedan arrived and parked across from the target house. The driver, front passenger and rear passenger exited the white sedan and walked to the house. Another smaller sedan arrived, and the driver exited and walked to the house. All of the car occupants went into 3255 North 34th Street together. On March 6, 2026, at 12:10AM, a Dodge Durango parked across from the target house. TFO Newport saw someone open the front door and stand in the front door waiting for the driver. Based on the video and the backlighting, TFO Newport believes that 3255

34

North 34th Street is the lower unit. At 1:36AM, three (3) people exited the house, all three (3) people walked to different vehicles and drove away. One of the vehicles was a white sedan, which maybe the white sedan that came to the house when Brian Brown was at the house. Another occupant of the house exited and appeared to call out to one of the people that left. That person walked back and grabbed something from the occupant of the house.

53. On March 5, 2026, TFO Newport searched through Law Enforcement records for any association of anyone at the T&C Auto Sales and Repair Shop ("auto body shop"), located at 8341 West Lisbon Avenue. Through a search, TFO Newport observed two people that were associated: Terry S. Robinson (black male, 08/17/1978) and Charles Holloway (black male, 10/18/1962). In MPD records, Charles Holloway provided an address that was similar to the auto body shop, which causes TFO Newport to believe that Holloway is using the auto body shop's address as his own.

54. TFO Newport also monitored jail calls made to 414-552-3446 (Charles Holloway). TFO Newport conducted a search through a law enforcement database, which showed that Charles Holloway has a phone number of 414-552-3446; a records check showed that the carrier was T-Mobile and assigned to Charles Holloway at 2512 South 76th Street (Milwaukee, WI). TFO Newport saw that Curtis Holloway often calls the Charles' phone number. Examples of their calls are enumerated below.

55. 10/19/2025, 15:01:12, CSN 801873679 (Curtis Holloway) - Curtis told Charles about a graduation. Charles said that things got tight and he is trying to figure some things out. Charles talked about all of his cars being paid for and how he has to go to the auction. Charles said that he has to go in because of all of the cars that he bought. Charles said that all he is doing is

35

rotating the cars. Charles said he buys cars one week, if they sell, he will go back to pay for the cars. Charles said that if the cars don't sell, he has to "get to hustling" to get the money to pay for the cars that he bought.

56. 11/06/2025, 15:28:52, CSN 810679331 (Curtis Holloway) - Curtis asked if he was at work. Charles said he was just leaving. Curtis spoke a lot about his family.

57. 12/22/2025, 16:07:05, CSN 832433711 (Curtis Holloway) - Curtis said that he was trying to call and talk to Charles when he was at the shop. Charles said that he was working under the cars. Curtis was trying to see if "T" was there (believed to be Terry Robinson). Charles said that they are in and out and are never there. Charles said that nobody is ever hanging at the shop. Charles said that they are doing alright and everyone is trying to make a dollar. Charles said that he sold a few cars, bought a few cars and that he doesn't make a lot off a car that you think he makes.

58. 12/27/2025, 15:39:17, CSN 834779431 (Curtis Holloway) - Curtis asked Charles for money for his birthday and asked if Charles was at the shop. Curtis said that he was in with a Love and that Love mentioned "Terry" and "Lil 39th."

59. 12/30/2025, 19:54:53, CSN 836374899 (Levonn Macon) - Macon asked Charles for the address for his business for employment for his business to show stability. Charles said that he can use it, but he is not the owner. Charles said that if they used the business, it's not listed in any government. Macon asked about someone and then said that something about "Jamal".

60. 2/3/2026, 11:51:03, CSN 851789637 (Curtis Holloway) - They were discussing money and putting money onto Curtis' jail account for calls. Curtis mentioned the name "Terry", believed to be Terry Robinson, the owner of the autobody shop.

36

61.     On March 6, 2026, TFO Newport searched through law enforcement records to locate an active phone number for Terry Robinson (auto body shop owner). TFO Newport found a phone number of (262) 277-6428. TFO Newport searched jail calls and located multiple jail calls, some from Curtis Holloway (who also called Charles Holloway), indicating to TFO Newport that this was Terry Robinson's phone number. TFO Newport heard the following calls involving Robinson.

62.     9/10/2025, 18:32:16, CSN 782148247 (Terry Robinson) - CCAP checked showed that Terry J. Robinson (DOB: 12/28/2002) was charged with several felonies under Milw. Co. 25CF3246. Suspected that this is Terry Robinson's son, supporting that belief that this is Terry Robinson's (auto body shop owner) phone number. They were discussing the charges. The person on the phone told the caller "I hear you son", indicating that it is Terry Robinson Junior in jail and Terry Robinson Senior that has control of (262) 277-6428. Terry mentioned "Rico" comes to get all the cars. Terry mentioned that "Eddie" recently got a new car. "Rico" got a 2016 Chrysler 200. "Mari" uses different rentals but wants to buy a car from Terry.

63.     10/7/2025, 16:57:59, CSN 796028139 (Terry Robinson) - Jr. Asked how everything was going. Terry said it was the same. Terry mentioned "Trey" not listening anyone. "Trey" said he was going to trial.

64.     10/16/2025, 11:46:30, CSN 800126163 (Terry Robinson) - Jr. asked about some woman coming to buy a car. The woman drove the car but said she would come back to buy it and never came back. Terry spoke about being a victim of stolen vehicles and property damage at the shop. Terry was going to the auction.

37

65. 3/1/2026, 12:37:24, CSN 864131005 (Terry Robinson) - Terry said that he was on the way to his shop. Terry said that he opened another shop that he opened by the house on "Fond Du Lac". Terry said that it was up and running. Terry said that he was supervising the old shop to help his guy out (believed to be Charles Holloway). Terry said that his new shop is bigger and can hold more cars. TFO Newport searched through records to find this new car shop that Terry purchased and opened.

66. On March 6, 2026, TFO Newport watched 3255 North 34th Street via electronic surveillance. TFO Newport saw Brian Brown left his house at approximately 11:30AM and went directly to 3255 North 34th Street, arriving at 11:32AM. Brown parked and waited in his Dodge Ram. TFO Newport saw a dark Toyota 4Runner go north on North 34th Street, turn around and go window to window with Brown. Brown rolled down his window, reached out with his left hand. Brown's left hand was facing palm down in a fashion which you would drop/provide something to someone. When Brown retreated his hand back into his car, he had his hand in a cupping fashion, as if to be holding an object. Based on the investigation and observations, TFO Newport believes this was a hand-to-hand deal with occupant(s) of the Toyota 4Runner. After the suspected deal, Brown and the Toyota drove away (also indicating a hand-to-hand). TFO Newport tried to get a good view of the license plate, which TFO Newport believed the plate to start with "243-Z". TFO Newport recalled Brian Brown meeting with a Toyota 4Runner in the past at the same location. TFO Newport reviewed that vehicle and saw the registration plate on that Toyota was "243-ZCW", which TFO Newport believes is the same vehicle that met with Brian Brown and conducted the hand-to-hand on March 6, 2026. TFO Newport watched Brown drive directly to 4923 West Center Street ("Barbershop"). At 11:54AM, the small white sedan arrived with the same person wearing

38

the same jacket exited and walked to the front door from last night and when Brian Brown arrived to the house on March 5, 2026. That male used a key to open the doors and entered the house. TFO Newport saw that the Louisiana registration plate on Toyota sedan was N649847. A DOT check showed that vehicle was a 2024 Toyota Corolla sedan, VIN 5YFB4MDE2RP192888; the registered owner was Enterprise Rental Cars. At 11:58AM, the same person exited. TFO Newport saw the male's face and his physicals, which based on those factors believes that this was Jamaal Kendrick that has a key, entered, and exited the 3255 North 34th Street. Kendrick walked towards the Toyota, entered and drove away. At 1:03PM, Brian Brown drove away from the barbershop. Brown drove the 2600 block of North 54th Street, waited for a couple of minutes and then drove to 2600 block of North 55th Street. Brown was there for a period of time before driving away taking an un-ordinary route ("cleaning"). Brown went to the 3100 block of North 48th Street, went to West Auer Avenue, turned around, went back to West Burleigh Street, circled the block around North 49th Street, stopped in the 3100 block by the alley. After a minute, Brown turned around and stopped, facing northbound. Brown was there for about 10 minutes before driving around to West Auer Avenue. Brown went to West Burleigh Street and North 30th Street, before conducting a U-turn to go back westbound on West Burleigh Street. Brown went to North 34th Street, went north, then east on West Auer Avenue, south on North 33rd Street, back to West Burleigh Street. Brown went to North 27th Street, turned north, and stopped in the 3200 block of North 27th Street (Jamaal Kendrick area). Brown was there for about 10 minutes before driving away northbound on North 27th Street. Brown drove to West Capitol Drive and went east to North Port Washington Road. Brown went north on Port Washington Road to Home Depot, located at 4155 North Port Washington Road, Milwaukee, WI. Brown circled the parking lot before parking in the middle of

39

the lot at 1:55PM. TFO Newport drove to the area, but Brian Brown moved. Brown drove to the Walmart (401 East Capitol Drive) and TFO Newport physically saw Brown park in the northwest portion of the parking lot. TFO Newport saw Brown did not exit his Dodge Ram and remained in the car. TFO Newport set up to watch Brown but had to leave for an unrelated operation. Later, TFO Newport checked the GPS data, which showed Brown parked there for twenty (20) minutes. Afterward, Brown drove to the area of 3255 North 34th Street and stopped for seventeen (17) minutes. TFO Newport watched the electronic surveillance, which showed the Dodge Ram park in front of the residence. Brown exited the Dodge Ram and grabbed items from the rear passenger seat. Brown carried grocery bags from the back seat into 3255 North 34th Street, appearing to use a key to open the front door after setting the bags down and inspecting the stairs for some reason. Brown then drove back to the 3200 block of North 27th Street and stopped for thirty-two (32) minutes. After that, Brown went home. Case agents noticed other patterns of "cleaning" by Brian Brown including visiting the same restaurant after going to a house and then driving blocks away and parking to eat; driving in one direction, stopping and going the other direction; driving a route, but turning and then completing a circle around the block to go back in the same direction he was already travelling. All of these, case agents believe, is Brian Brown attempting to check for cars following him by conducting countersurveillance.

67. On March 8, 2026, TFO Newport saw that Brown went to 3255 North 34th Street at 10:49AM. Later, TFO Newport reviewed electronic surveillance, which showed the Dodge Ram arriving at the residence. TFO Newport saw Brian Brown walk across the street and up the stairs leading to 3257 North 34th Street. Brown walked to the front door to 3255 North 24th Street and entered. A short time later, Brown exited the residence carrying a bag with his left hand.

40

68. On March 9, 2026, TFO Newport watched T&C Auto Sales and Repair LLC (8341 West Lisbon Avenue). TFO Newport saw Charles Holloway standing around on the lot, moving vehicles. There were multiple people at the business, walking around, inspecting cars. There was a pitbull dog on the premises with a person who walked the dog around the lot and was loitering and speaking to the workers (appeared to be a manager role). It was hard to determine if that person was Terry Robinson, because TFO Newport's photograph of Robinson's face for comparison is old. While TFO Newport was watching T&C, TFO Newport checked to see if Brian Brown was mobile. TFO Newport saw that the GPS was stationary. TFO Newport watched the electronic surveillance of 3255 North 34th Street and saw that Brian Brown was sitting on the front porch with an unknown person. TFO Newport saw that Brown did not use his Dodge Ram but drove his Cadillac Escalade to the house. TFO Newport drove to the area to watch vehicles or other people that would join Brown and the other unknown person.

69. TFO Newport reviewed the electronic surveillance and saw a black Toyota 4Runner park around 12:25PM. The unknown male exited the passenger side of the Toyota, carrying a black bag and entered 3255 North 34th Street, passing Brian Brown on the front porch. The Toyota drove away south. The Toyota turned around and came back north, passing the house. The Toyota pulled up to the house, facing south, as soon as the male that exited the car before, exited the house. The previous occupant of the Toyota walked to the Toyota from 3255 North 34th Street, carrying a bag. He went to the rear passenger seat, placed the bags into the rear passenger compartment, and walked away. The Toyota drove away and the unknown male sat on the porch next to Brian Brown. Around 1:00PM, the male and Brian Brown went into the house together. They exited carrying bags, and each had a backpack. The unknown male had a light blue backpack, and Brian Brown

41

had a black backpack. They set the bags onto the porch and waited. By this time, TFO Newport was watching the front of the residence. TFO Newport was watching Brian Brown and the unknown person through electronic surveillance and saw them stand up as soon as a blue 2024 Chrysler Town and County Van (TX VHZ4122), VIN 2C4RC1BG4RR186675 parked in front. Brian Brown and the unknown male walked to the car, carrying all of the bags from the house. They both loaded the bags into the car. TFO Newport saw the driver was a black male wearing a red jacket. When the van drove away, TFO Newport saw Brian Brown in the front passenger seat. It appeared there were other occupants in the rear seats. TFO Newport attempted to locate the white Toyota Corolla at Jamaal Kendrick's associated residences but was unsuccessful. TFO Newport used Law Enforcement databases to aid in locating that car. TFO Newport saw through electronic surveillance that car was in Illinois on March 7, 2026, travelling south. On March 8, 2026, TFO Newport saw the Toyota was to the south of Indianapolis. On March 9, 2026, the Toyota was back in the south side of Chicago.

70.    On March 11, 2026, TFO Newport observed through electronic surveillance that the white Toyota Corolla (LA N649847) was back in Milwaukee. TFO Newport further searched through electronic surveillance and saw that the car was parking in the area of North 20th Street and West Michigan Street. TFO Newport recalled a previous vehicle that TFO Newport watched was also parked in this area (believed to be operated by Jamaal Kendrick). TFO Newport drove to the area and did not locate the Toyota Corolla. TFO Newport did see Jamaal Kendrick's black 2021 Lincoln Aviator (WI BCP-8074, VIN 5LM5J7XC9MGL13534) parked in front of 2032 West Michigan Street, Milwaukee, WI. Parked in front of the Aviator was a silver 2008 Honda SUV (Ontario plate CYCR064, VIN 5J6YH189X8L800894); a DOT check showed Canada listed the

42

registered owner as Sean David from 6258 Talbot Trail, Merlin. TFO Newport watched the car to see if Jamaal Kendrick exited 2032 West Michigan Street. At 12:28PM, TFO Newport saw the vehicle lights turn on and the engine start (indicating remote start). At 12:41PM, TFO Newport saw a black female wearing a black ADIDAS jacket and gray pants walk down the steps of 2032 West Michigan Street, enter the Lincoln and drove away.

71.     TFO Newport conducted a search of available databases for any relationships involving Jamaal Kendrick. TFO Newport found, under Milwaukee County case number 2023PA000629PJ, that Jamaal Kendrick had a paternity case with Laquita L. Roberson (DOB: 01-1986). TFO Newport searched law enforcement records and found Laquita L. Roberson (black female, 01-23-1986). TFO Newport looked at Roberson's Wisconsin driver's license photograph. TFO Newport compared a surveillance photo to Roberson's driver's license photo and believe that was the same person that was driving Kendrick's Lincoln Aviator. Therefore, TFO Newport believes that there is a nexus between 2032 West Michigan Street and Jamaal Kendrick; TFO Newport based that on the electronic surveillance of cars associated with Jamaal Kendrick in the area and the woman leaving that house and driving Kendrick's car that was parked in front of the house.

72.     TFO Newport saw on March 12, 2026, around 1:05AM, multiple vehicles arrived at 3255 North 34th Street. Occupants exited the vehicles and entered the 3255 North 34th Street residence. TFO Newport saw occupants carrying bags from the cars into the house. About 10 minutes later, two people exited the house carrying a bag, entered what appeared to be a van, then walked back to the other vehicle that pulled up and parked behind the van, and handed them something. The two occupants that exited the house then walked back towards the house. One of

43

the people stopped and walked back to the other vehicle that they just came from, entered the front passenger seat, and drove away. The other occupant went back into the house. TFO Newport saw that while the occupants were inside the house, the interior lights to the lower were on and the upper were off. Around 2:41AM, a heavier set person exited the house and went into the trunk of the van, entered the van and drove away. At 3:13AM, a person that appeared to be Brian Brown exited the front door, all of the interior lights were turned off, entered the Brian Brown's Cadillac and drove away. TFO Newport saw that Brian Brown was carrying a package from the house to his car when he drove away. Later in the day, around 10AM, Brian Brown came to the house, unlocked and entered the front door. At 10:26AM, Brian Brown exited the house and stood on the porch. Right after Brian Brown came onto the porch, a blue Chrysler van (matching the same color/style van that TFO Newport saw Brian Brown leave in) arrived. The driver appeared to be Jamaal Kendrick, based on physical description and a jacket that TFO Newport previously believed Kendrick to be wearing during surveillance. Brown and Kendrick went into the house together. At 10:32AM, Brown and Kendrick exited the house. Brown was carrying a back pack. Kendrick walked to the van. Brown walked out of sight. TFO Newport checked electronic surveillance of license plates throughout the United States and saw that on March 11, 2026, that vehicle was coming northbound at the southern Illinois border, but there was no other travel south (suspected to have taken a less travelled route).

73.    TFO Newport at some point discovered that Brian Brown was utilizing a different vehicle than his blue Dodge Ram truck through electronic surveillance. On March 19, 2026, TFO Newport was watching 3255 North 34th Street. Brian Brown arrived in a black Cadillac Escalade, bearing Wisconsin plate ARW-1568. TFO Newport recalled seeing this car multiple times around

44

3367 North 50th Street. On this occasion, Brian Brown went to 3255 North 34th Street for about 10-15 minutes, then left and came back sometime later, visited for a short time and then left again; this behavior is consistent with previous surveillance of the residence associated with Brian Brown and Jamaal Kendrick. TFO Newport conducted a check of the registration plate, where TFO Newport ascertained that the Cadillac is a black 2015 Cadillac Escalade, Wisconsin registration plate of ARW-1568, VIN of 1GYS4SKJ5FR736834. The VIN is registered to Savannah Brown of 3367 North 50th Street, who also registered Brian Brown's Dodge Ram. The registration plate ARW-1568 is registered to Lancha Frierson (DOB: 05/29/1966), of 3367 North 50th Street (Brian Brown's house). TFO Newport saw that Brown was frequently using his Cadillac Escalade through electronic and physical surveillance in March 2026.

74.     Towards the end of March 2026, however, TFO Newport saw, via GPS data, that Brown was using the Dodge Ram again. TFO Newport received notifications that Brown was repeatedly visiting the area around 3255 North 34th Street. Based on the recent movements involving the Dodge, TFO Newport obtained authority to continue tracking that vehicle.

75.     On April 11, 2026, TFO Newport tracked Brian Brown through physical surveillance and electronic surveillance. TFO Newport saw that Brown was in the 3400 block of North 53rd Street. TFO Newport saw the Dodge was parked facing southbound, unoccupied. At 2:02PM, Brown appeared from the west side of North 53rd Street, entered the Dodge Ram, and left. TFO Newport followed Brown home to 3367 North 50th Street. A short time later, TFO Newport saw that Brown drove away from his house, and TFO Newport followed him to the 3200 block of North 27th Street, where Brown parked about 1-2 houses south of 3246/3248 North 27th Street, Milwaukee.TFO Newport saw a black male wearing gray sweat suit jogged across the street

45

and enter the passenger side of Brown's Dodge Ram. A gray Infiniti arrived and parked in front of 3248 North 27th Street. A black male wearing a brown vest exited and walked around the back of the car. Another black male appeared from the south and walked to Brown's passenger side and entered the car; that black male later exited the car and walked back southbound on North 27th Street away from the car. TFO Newport saw a subject believed to be Jamaal Kendrick walk down the steps of 3246/3248 North 27th Street, walk to the front passenger door, speak with Brown and then walk to a black Chrysler Pacifica bearing a dark blue registration plate that TFO Newport could not read. While Brown was loitering, a black male wearing all blue appeared from the south side of 3248 North 27th Street and looked to the south where Brown was located. That male then walked up the front porch to 3246/3248 North 27th Street, but TFO Newport could not see which door he used. A short time later, that male exited the upper (3248 North 27th Street) door to the balcony. That male again looked down to the south where Brown was and made a signal with his hands pointing to the west in some fashion; that male went back inside of the house. Another short time later, the male that was driving the gray Infiniti SUV appeared onto the same upper balcony, looked to the south where Brown was and then entered the balcony door to go back inside. The black male wearing all gray exited Brown's Dodge Ram and ran back across to the west side of North 27th Street. TFO Newport could see that person entering a vehicle and a black Jeep Grand Cherokee conducted a U-turn, consistent with that person entering that car and driving away. TFO Newport saw that a black male wearing a gray sweatshirt was driving. The Jeep had a Wisconsin registration plate of BAF-4511. As soon as the Jeep drove away, Brown left the area, and this behavior was consistent with meeting at a location to conduct an illegal transaction. TFO Newport

46

followed Brown back to the 3400 block of North 53rd Street. TFO Newport saw that the gray Infiniti SUV plate was AAP-1221.

a. Based on the characteristics of Brown's driving, TFO Newport believes that Brown left his first location to go home and pick up narcotics to conduct deals with multiple people at a neutral location in the 3200 block of North 27th Street, where Jamaal Kendrick was. After all of the people left, Brown left the area and returned to his first location; therefore, TFO Newport believes that Brown is also storing controlled substances at his residence of 3367 North 50th Street. Documents, paraphernalia, and other material related to his drug dealing are also likely to be found at that location.

76. TFO NEWPORT reviewed GPS data along with surveillance of 3255 N. 34th St. from April 1, 2026 to May 8, 2026:

77. TFO NEWPORT observed that from April 1, 2026 to May 8, 2026, two locations showed the heaviest traffic from Brian BROWN: Brian BROWN's home of 3367 North 50th Street and 3255 N. 34th St., which is BROWN's second heavily frequented location. TFO NEWPORT saw that BROWN visited 3255 N. 34th St. 34 times between April 1, 2026 to May 8, 2026. The least amount of time spent at the location was 22 seconds and the most time spent at the location was 1 hour and 52 minutes, with a total amount of time frequented was 18 hours, 2 minutes and 22 seconds. TFO NEWPORT saw that BROWN visited 3367 N. 50th St. 159 times between April 1, 2026, to May 8, 2026. TFO NEWPORT saw that there was significant time spent at this location with the investigation showing that Brian BROWN lives at this residence. The total amount of time spent at his residence was 601 hours, 8 minutes, and 39 seconds.

78. Below are the snapshots of the two locations and the frequency which BROWN goes to said locations:

3255 N. 34th St.



3367 N. 50th St.



79. TFO NEWPORT reviewed surveillance of 3255 N. 34th St. and noted the following:

48

- April 1, 2026, 2:33PM: BROWN arrived in his blue Dodge Ram. BROWN went into 3255 N. 34th St. for about a minute and then left.

- April 1, 2026, 3:31PM: BROWN arrived in his blue Dodge Ram. BROWN did not go into the stash house.

- April 3, 2026, 2:07AM: BROWN arrived in his blue Dodge Ram. BROWN did not go inside until 4:21AM, when he approached with someone who was carrying a duffle bag over their right shoulder. BROWN opened the front door and the lights to the lower turned on. At 4:35 AM, BROWN exited the house and walked towards his car. BROWN returned and closed the gate to the front fence. At 6:11 AM, BROWN and the associate exited the house. The associate was carrying something that appeared to be heavy under their right arm, close to their body, while leaning away to support the weight.

- April 3, 2026, 5:17PM: BROWN arrived in his Dodge Ram. A black Toyota 4Runner (possibly the same 4Runner that TFO NEWPORT has seen in the past associated with Brian BROWN) also parked in front of the house. BROWN walked to the front door and entered. A front passenger from the 4Runner joined BROWN in the house carrying a white bag. At 5:21PM, BROWN exited the house and walked to his truck and left, leaving the front passenger from the 4Runner in the house. At 5:39PM, BROWN returned and entered the house. At 6:34PM, the 4Runner passenger left the house carrying a white bag in his right

49

hand that appeared to be full. At 10:59, a van arrived and the driver went inside. The vehicle's appearance was consistent with Jamaal KENDRICK's rental car.

- April 5, 2026, 1:16PM: BROWN arrived in his pickup. BROWN grabbed something from the front porch and entered the house. At 2:17PM, BROWN left the house.

- April 6, 2026, 7:44PM: BROWN arrived in his pickup. BROWN went into the rear passenger seat and then entered the house. At 7:51PM, BROWN exited the house carrying a small white bag with his right hand. BROWN left in the pickup.

- April 7, 2026, 7:15AM: BROWN arrived in his pickup. BROWN entered the house. At 7:36AM, BROWN left the house.

- April 13, 2026, 12:06PM: BROWN arrived in his pickup. A black minivan (resembling Jamaal KENDRICK's) arrived behind BROWN. The driver, based on physical appearance, appeared to be KENDRICK exited and walked to the house and entered. At 12:00PM, BROWN exited and entered the house. At 1:37PM, KENDRICK and BROWN left the house.

- April 16, 2026, 7:48PM: At 8:03PM, a black minivan (similar to KENDRICK's) and another car parked behind parked and the occupants entered the house. TFO NEWPORT did not see BROWN.

- April 17, 2026, 2:03PM: TFO NEWPORT saw BROWN's pickup arrive, but BROWN did not exit.

- April 19, 2026, 1:57PM: BROWN arrived in his pickup. KENDRICK exited the front passenger seat of the truck. BROWN exited the driver. Both walked to the

50

front door and entered. KENDRICK opened the front door. At 2:14PM, BROWN left the house without KENDRICK. Around 2:43PM, a black Silverado pulled up. The driver exited, walked and met KENDRICK at the front door. At 3:03PM, a white car appeared, an occupant walked towards and entered the front door. At 3:05PM, that same occupant left and then came back carrying a bag. At 3:07PM, BROWN, the driver of the Silverado, and the occupant of the white car exited the house together. KENDRICK shortly followed them out. KENDRICK ran towards the white car, the occupant of the white car and the Silverado driver went to BROWN's truck.

- April 19, 2026, 7:07PM: BROWN came back in his pickup. The Silverado driver exited the front passenger seat, entered the Silverado and left.

- April 23, 2026, 2:55PM: BROWN arrived in his pickup. At 2:59PM, a black 4Runner (similar to the one observed on previous surveillance) arrived. TFO NEWPORT could see some type of exchange occur between BROWN and the front passenger window, where BROWN collected something from the occupant of the 4Runner. The 4Runner drove away. At 3:04PM, a black minivan (similar to KENDRICK's) arrived and parked. BROWN exited his truck. The physicals of the driver of the minivan appeared to be KENDRICK. At 3:09PM, KENDRICK left the house. KENDRICK came back shortly. At 4:10PM, BROWN and KENDRICK left the house together. TFO NEWPORT believes that this was a hand-to-hand drug transaction from two vehicles. Through TFO NEWPORT's training and experience, TFO NEWPORT has observed hand-to-

51

hand drug transactions between two vehicles in the past. TFO NEWPORT has commonly seen dealers/purchasers set up a meet location, and knows they prefer places they feel secure (like BROWN would feel secure near 3255 N. 34th St., as seen in the past). The dealer (BROWN) arrives and then purchaser (4Runner) meets with the dealer. There is an exchange between the dealer and passenger and then the purchaser and/or dealer part ways. Based on his experience and knowledge of how these transactions typically go, TFO NEWPORT believes that BROWN conducted a hand-to-hand drug transaction with the 4Runner at this time.

- April 23, 2026, 5:29PM: BROWN arrived in his pickup. BROWN entered the front door. At 5:30PM, BROWN exited and left.

- April 28, 2026, 12:20PM: BROWN arrived in his pickup. BROWN entered the front door. At 12:24PM, BROWN left.

- May 2, 2026, 12:23AM: BROWN arrived in his pickup. BROWN entered the front door.

- May 4, 2026, 8:34PM: BROWN arrived in his pickup. BROWN did not go to the house. TFO NEWPORT saw movement around BROWN's truck. At 8:51PM, BROWN's truck drove away.

- May 5, 2026, 1:14PM: BROWN arrived in his pickup. BROWN exited and walked to the driver door of a beige Chevrolet Tahoe that was parked in front of the house. BROWN spoke with the driver and then BROWN leaned into the driver compartment through the window with his right arm. After, BROWN put

52

his hand in his right pant pocket. BROWN then entered the rear passenger compartment on the driver's side. BROWN did not enter the car, but closed the door and walked away. The Tahoe drove away. BROWN entered the house. At 2:04PM, BROWN walked to the driver door of his pickup and then walked back to the house. At 2:12PM, BROWN left. TFO NEWPORT believes that this was a hand-to-hand drug transaction. In Officer NEWPORT's training and experience, TFO NEWPORT has observed hand-to-hand drug transactions. Officer NEWPORT believes that BROWN's behavior is consistent with drug dealing; BROWN concealed his movements inside of the passenger compartment of the car (commonly done when providing drugs), then when BROWN retrieved his right arm from the car, BROWN appeared to place something in his pocket (commonly done when securing money). BROWN then moved towards the rear passenger compartment and concealed his movement with the rear passenger door.

- May 5, 2026, 2:42PM: BROWN returned to the house. BROWN exited his truck and walked to the neighbor's house to the north. The tan Tahoe returned to the house. BROWN was looking towards the occupants of the Tahoe. The occupants started exiting the Tahoe. One of the occupants walked to the maroon Tahoe that is frequently parked in front of the residence. Another occupant walked to the upstairs neighbor's house 3357 N. 34th St. Another occupant walked towards the BROWN's truck door and appeared to speak with him but did not walk completely to the driver door. The occupant that went to the maroon Tahoe

53

walked to the front passenger door of BROWN's pickup and appeared to talk with him. The other occupant that went towards the driver's door went to the front door of 3355 N. 34th St. That occupant entered the 3255 N. 34th St. That occupant exited BROWN's house and walked to the Tahoe. That occupant went back up to the house and did something with the front door, entered the Tahoe and then drove away, passing BROWN. BROWN loitered at the residence. Around 3:41PM, a neighbor from the north residence exited their house, entered BROWN's truck and BROWN drove away.

- May 6, 2026, 11:21AM: BROWN arrived in his truck. BROWN exited and entered the house. At 11:27AM, BROWN left the house.

- May 6, 2026, 1:31PM: BROWN arrived in his truck. BROWN went in to the rear passenger seat of his truck. BROWN carried an object from his truck into the house. At 1:35PM, BROWN left.

- May 7, 2026, 10:21AM: BROWN arrived in his truck. The neighbor from the north house entered the front passenger seat of BROWN's truck. At 10:27AM, BROWN exited and entered his house, and the neighbor went back to their house. Around 10:28AM, BROWN left. At 12:39PM, BROWN returned to the house. BROWN exited the car holding a black backpack or duffle bag and carried it into his house. At 1:15PM, BROWN exited the house carrying the black bag, and left. At 8:02PM, BROWN arrived in his truck. BROWN entered the house. At 8:05PM, BROWN exited the house and left.

54

- May 8, 2026, 1:26PM: BROWN arrived in his truck. BROWN entered the house. At 1:30PM, BROWN exited carrying a white bag. BROWN placed the bag in the back of his pickup truck. BROWN left. At 5:16PM, BROWN returned to the house. BROWN exited the car, now carrying the white bag that was in the passenger compartment and not in the bed of the truck. BROWN returned to his truck and went back into the house. At 5:42PM, BROWN left the house, carrying a white bag, entered his truck and left.

- May 9, 2026, 12:58PM: BROWN arrived in his truck. BROWN exited carrying a black object in front of him with his left arm. BROWN entered the house. At 1:15PM, BROWN left.

- May 10, 2026, 8:49AM: BROWN arrived in his truck. BROWN exited and entered the house. At 8:52AM, BROWN exited and left. At 10:42AM, BROWN returned to the house. BROWN exited carrying a black backpack or duffle bag and entered the house. At 10:46AM, BROWN exited the house carrying the same bag and left.

80. Officer NEWPORT believes that this surveillance was significant, because of the interview with Kenneth WADE. WADE provided his statement about his source of supply "Brian JONES", who through the investigation Officer NEWPORT believes to be Brian BROWN, based on physical description by WADE, along with physical surveillance of BROWN coming and going from the residence and BROWN's fingerprints found on the vacuum sealer. During the interview, WADE stated that his source of supply would come to the house carrying a duffle bag. Through Officer NEWPORT's training and experience, Officer NEWPORT knows that drug dealers

55

commonly carry narcotics in a variety of bags to conceal from plain view such as: satchels, backpacks, duffle bags, purses, opaque grocery bags, pockets, sweatshirt pockets, etc. to keep contraband concealed. Officer NEWPORT seeing BROWN carrying a duffle bag to and from the residence is consistent with WADE's statements regarding his source of supply using a duffle bag to transport narcotics. BROWN carried a duffle bag to and from the residence on multiple occasions in the last couple of weeks, even having someone carrying a bag that appeared to have significant weight to it from the residence. Lastly, BROWN used a previous residence of Kenneth WADE to package, store, sell cocaine based on the vacuum sealer and testing of the substance on the sealer; therefore, Officer NEWPORT believes that BROWN could use another one of WADE's residences to conduct the same criminal activity.

81. Based on the frequency of BROWN's visits to this location; the short duration of time spent during particular visits; the suspected hand to hand drug deals at the location from previous surveillance; the previous knowledge that BROWN uses other residences to secure large scale drug packaging material, TFO NEWPORT believes that this residence is being used as a secure location for narcotics by Brian BROWN and Jamaal KENDRICK. TFO NEWPORT saw, through Law Enforcement records, that Kenneth WADE provided this residence as his address in the past, providing the nexus between WADE and BROWN to 3255 N. 34th St. Officer NEWPORT knows through training and experience that drug dealers will commonly use residences of associates to continue their drug dealing. Officer NEWPORT believes that BROWN is using that same tactic, believing that BROWN is using 3255 N. 34th St. to store, manufacture, maintain, and/or conceal controlled substances for distribution at 3255 N. 34th St.

56

82. Officer NEWPORT also knows from training and experience that drug dealers will commonly separate proceeds of drug dealing from their drug supply to evade law enforcement seizure. Officer NEWPORT knows that it is common for dealers to distance themselves from the controlled substance (3255 N. 34th St.) and maintain the proceeds near them to facilitate quick re-supplies and secure the proceeds to purchase more controlled substances. Officer NEWPORT has found it common to find large amounts of suspected drug proceeds within the residences where suspects live (3367 N. 50th St.).

83. Lastly, Officer NEWPORT reviewed surveillance of BROWN and compared the times that BROWN was coming and going from 3255 North 34th Street. The short times or repeated visits is also consistent with drug dealing. Through Officer NEWPORT's drug investigations, Officer NEWPORT has seen a common trend with mobile drug dealing. Officer NEWPORT has heard the term "carry only what you need" utilized by drug dealers as part of his drug investigations. In Milwaukee, mobile drug dealing is a prevalent drug dealing trend. Officer NEWPORT has found it common for dealers to maintain large amount of controlled substances in vehicles for distribution; however, the consequence of carrying large amounts of narcotics is the prison exposure that comes with it if the dealer is apprehended. Officer NEWPORT's investigations have shown that dealers often attempt to evade large prison exposure by carrying "only that they need" to complete their purchasers orders. Officer NEWPORT believes that BROWN is also exhibiting this same behavior which would require BROWN to return to the residence to secure more controlled substances for distribution. Additionally, securing more controlled substances would not take that much time, which would cause Officer NEWPORT to believe that it why BROWN is so sporadic with his frequent visits to 3255 N. 34th St.

57

84.     Based upon the facts contained in this Affidavit, your Affiant submits there is probable cause to believe that the items listed in Attachment B will be found at the **TARGET PREMISES.**

85.     Based on my training, education, and experience, and discussions with other trained law enforcement personnel, along with information provided by sources of information and confidential sources, your Affiant knows the following:

   a. Drug dealers often keep significant sums of United States currency on hand in order to maintain and finance their ongoing distribution activities. Drug dealers commonly maintain such currency where they have ready access to it, such as in their homes and vehicles. It is also common for drug dealers to possess drug proceeds and items purchased with such proceeds in their homes and vehicles. Thus, it is common for currency, expensive jewelry, precious metals, or financial instruments to be found in the possession of drug dealers.

   b. Drug dealers and persons involved in the manufacturing, distribution, and possession with intent to distribute controlled substances often possess firearms and other weapons, both legal and illegal, in order to protect their persons, drugs, or the proceeds of drug transactions. Drug dealers commonly maintain such firearms and weapons where they have ready access to them, such as on their person, in their homes, and in their vehicles. In addition, other firearm-related items, such as gun pieces, ammunition, gun cleaning items or kits, holsters, ammunition belts, original box packaging, targets, expended pieces of lead, photographs of firearms, and paperwork showing the purchase, storage, disposition, or dominion and control

58

over firearms, ammunition, and related items are commonly possessed by drug dealers along with their firearms.

c.  Drug dealers often maintain paraphernalia for manufacturing and distributing controlled substances, including packaging materials, scales, and cutting agents. Drug dealers commonly maintain such paraphernalia at stash houses, in their homes, or in their vehicles.

d.  Drug dealers often maintain paper records of their drug trafficking activities, including ledgers; handwritten addresses or telephone numbers in books or papers reflecting names, addresses and/or telephone numbers of criminal associates; paperwork relating to various properties, including storage facilities, where contraband or illicit proceeds may be kept, etc.  Your Affiant knows that such records are commonly maintained for long periods of time and therefore are likely to be found at the **TARGET PREMISES**.

e.  Drug dealers commonly use computers, cellular telephones, and other electronic devices to communicate with other drug dealers and customers about drug-related activities through the use of telephone calls, text messages, email, chat rooms, social media, and other internet- and application-based communication forums. Moreover, drug dealers commonly use other capabilities of computers and electronic devices to further their drug distribution activities.  Therefore, evidence related to drug-distribution activity is likely to be found on electronic storage media found at the **TARGET PREMISES** as further described below.

59

86.    In addition to items which may constitute evidence, fruits and/or instrumentalities of the crimes set forth in this Affidavit, your Affiant also requests permission to seize any articles tending to establish the identity of persons who have dominion and control over the **TARGET PREMISES**, including rent receipts, utility bills, telephone bills, addressed mail, personal identification, keys, purchase receipts, sale receipts, photographs, vehicle pink slips, and vehicle registration.

87.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the **TARGET PREMISES**, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive, cellular telephone, or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

88.    *Probable cause.*  I submit that if a computer, cellular telephone, or storage medium is found on the **TARGET PREMISES**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons;

   a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a

60

computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the storage medium that is not currently being used by an active file – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media – in particular, computers' internal hard drives – contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because of special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache".

89. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described in the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe

61

that this forensic electronic evidence will be on any storage medium in the **TARGET PREMISES** because.

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what task and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

    b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who

62

has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media exculpating the computer owner. Further, computer and storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user.

63

Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of

64

counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. I know that when an individual uses a computer to operate a website that is used for illegal conduct, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

90. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure of imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

65

a. *The time required for an examination.* As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. *Technical requirements.* Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

66

c. *Variety of forms of electronic media.* Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

91. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

67

**ATTACHMENT A**

*LOCATIONS TO BE SEARCHED*

3255 N. 34th Street, Milwaukee, WI and 3367 N. 50th Street, Milwaukee, WI (collectively, the TARGET PREMISES)



3255 N. 34th Street, Milwaukee, WI is the lower of a two story duplex, having a tan/green siding with yellow trim. The numbers 3255 are vertically displayed to the south of the east facing front entrance door to 3255 N. 34th St. The area to be searched includes the attic, basement, garages, storage lockers, crawlspaces, safes, and common areas that are accessible to the occupants of the lower residence, as well as Brian Brown.

68



3367 N. 50th Street, Milwaukee, WI is a two-story single family residence featuring brick siding with white siding; the numbers "3367" are horizontally displayed to the north of the east facing entrance door to 3367 N. 50th St. The area to be searched includes the attic, basement, garages, storage lockers, crawlspaces, safes, and common areas that are accessible to the occupants of the residence, as well as Brian Brown.

69

1.  The items to be seized are evidence, contraband, fruits, records or instrumentalities relating to violations of Title 21, United States Code, Sections 841(a)(1) (possession with the intent to distribute and distribute controlled substances), 846 (conspiracy to possess with the intent to distribute and distribute controlled substances), and 843(b) (use of communications facilities to facilitate controlled substance felonies) from January 1, 2025 to the date of this warrant, namely:

    a.  Controlled substances and/or paraphernalia;

    b.  Packaging for controlled substances;

    c.  Drug ledgers and/or documentation;

    d.  Records and information relating utility bills, writings, cell phones, computers, receipts, notes, ledgers, receipts and/or other documentary evidence establishing who is in control of the premises;

    e.  Firearms, including pistols, handguns, shotguns, rifles, assault weapons, machine guns, magazines used to hold ammunition, silencers, components of firearms, including laser sights and other components which can be used to modify firearms, ammunition and ammunition components, bulletproof vests, gun boxes, and any and all documentation related to the purchase of such items;

    f.  Records of off-site storage locations, including but not limited to safe deposit box keys and records, and records and receipts and rental agreements for storage facilities;

    g.  Duffel, canvas bags, suitcase, safes, or other containers to hold or transport controlled substances and drug trafficking related items and proceeds;

    h.  Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, bank statements, safe deposit box keys and records, money containers, financial records and notes showing

70

payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances;

    i. Photographs, videotapes, or other depictions of assets, firearms, co-conspirators, or controlled substances; and,

    j. Records and information relating to the identity or location of Brian Brown.

2. Any digital device which is itself or which contains evidence, contraband, fruits, records, or instrumentalities of the **TARGET OFFENSES**, and the forensic copies thereof.

3. Any digital device which is itself or which contains evidence contraband, fruits, records, or instrumentalities of the **TARGET OFFENSES**, and forensic copies thereof.

4. With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

    a. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

    b. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. evidence of the attachment of other devices;

    d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

    e. evidence of the times the device was used;

    f. applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

    g. records of or information about Internet Protocol addresses used by the device.

71

5. As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

6. As used herein, the term digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras, gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## SEARCH PROCEDURE FOR DIGITAL DEVICES

7. In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

    a. Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be search at that location. The search team shall complete the search as soon as practicable but not to exceed 120 days from the date of execution of the warrant. The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

72

b.  The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

  i.  The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

  ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

  iii.  The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

b.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

c.  If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as practicable, return the device and delete or destroy all forensic copies thereof.

d.  If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data and may access such data at any time.

e.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government

73

may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

f. The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

g. After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

i. The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

ii. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

74